STATE of Rhode Island

v.

LEAD INDUSTRIES ASSOCIATION,
INC., et al.

Nos. 2004–63–M.P., 2006–158–
Appeal, 2007–121–Appeal.

Supreme Court of Rhode Island.

July 1, 2008.

Neil Kelly, John McConnell, Fidelma Fitzpatrick, Genevieve Allaire–Johnson, James Lee, Providence, for Plaintiff.

John A. MacFadyen, III, Donald Scott, Pro Hac Vice, Joseph Cavanagh, Laura Ellsworth, Pro Hac Vice, Paul M. Pohl, Pro Hac Vice, Thomas Bender, William Kayatta, Pro Hac Vice, John Tarantino, for Defendants.

Present: WILLIAMS, C.J., FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

**Addressing the issues** *seriatim* **for a unanimous Court, Chief Justice Williams authored Tracks I and II and Associate Justices Suttell, Flaherty, and Robinson authored Tracks III, IV, and V, respectively.** In this landmark lawsuit, filed in 1999, the then Attorney General, on behalf of the State of Rhode Island (the state), filed suit against various former lead pigment manufacturers and the Lead Industries Association (LIA), a national trade association of lead producers formed in 1928.

After the first trial resulted in a mistrial, a second trial commenced; that second trial, spanning four months, became the longest civil jury trial in the state's history.[1] This monumental lawsuit[2] marked the first time in the United States that a trial resulted in a verdict that imposed liability on lead pigment manufacturers for creating a public nuisance.

After a four-month trial, which concluded on February 22, 2006, a jury found defendant manufacturers, NL Industries, Inc. (formerly National Lead Co.) (NL), The Sherwin–Williams Co. (Sherwin–Williams), and Millennium Holdings LLC (Millennium) (collectively defendants), liable under a public nuisance theory.[3] Both before and after the jury returned its verdict, the trial justice issued nineteen written decisions, ruling on a variety of pre-trial, trial, and post-trial motions that both the state and defendants had filed. The defendants filed an appeal from the judgment entered against them. The state, for its part, appealed the judgment in favor of defendant Atlantic Richfield Co. (ARCO) and two contempt orders that had been entered against the Attorney General. In addition, in 2004, defendants had petitioned this Court for a writ of certiorari to review the issue of contingency fees. We issued the writ, but thereafter concluded that the matter was not then justiciable. *See State v. Lead Industries Association, Inc.*, 898 A.2d 1234, 1235 (R.I.2006). The

---

1. *See State of Rhode Island v. Lead Industries Association, Inc.*, No. PC 99–5226, 2007 WL 711824, 2007 R.I.Super. LEXIS 32 (Feb. 26, 2007); *see also* Peter B. Lord, *Jurors in lead-paint trial say they're proud of verdict*, The Providence Journal, Mar. 12, 2006, at B1 (noting that "court officials believe [the lead paint trial] was the longest civil trial in state history").

2. Lisa A. Perillo, *Note: Scraping Beneath the Surface: Finally Holding Lead–Based Paint Manufacturers Liable by Applying Public Nuisance and Market–Share Liability Theories?*, 32 Hofstra L.Rev. 1039, 1041 (2004).

3. The members of this Court extend their sincere gratitude and appreciation to Justice Michael A. Silverstein and his staff, especially court reporter Rosemary Patalano and clerk Jean Maggiacomo, for their diligent work through two trials, nineteen written rulings, and thousands of transcript pages of testimony and hearings. We also thank counsel for the respective parties for their cooperation in participating at numerous scheduling conferences and in providing the Court with electronic appendices, thereby helping us effectively to tackle this difficult and problematic case. Finally, we would be remiss if we did not recognize that the briefs of the parties and of the amici curiae and the oral arguments by counsel were particularly helpful to us.

defendants have asked this Court to entertain that petition again. Finally, the state cross-appealed on the issue of compensatory damages.

Because of the sheer number of parties and the complexity of issues involved in these appellate proceedings, this Court consolidated all the appeals filed with this Court and established a five-track procedure for the briefing of all pending appeals and cross-appeals. The five tracks are: (1) the individual liability appeals of defendants, Millennium, NL, and Sherwin–Williams, from the judgment of abatement in favor of the state; (2) the state's cross-appeal on the issue of compensatory damages; (3) the state's appeal from the judgment in favor of ARCO and ARCO's conditional cross-appeal; (4) the state and the Attorney General's appeal of contempt orders entered in December 2005 and June 2006 against the state Attorney General; and (5) the issue of the propriety of the state's entering into a contingency fee agreement with private counsel to prosecute the public nuisance action, which issue is before us pursuant to our issuance of a writ of certiorari. This Court heard oral arguments on each appeal on May 15, 2008. This opinion addresses the issues *seriatim.*

## Track I

## Liability

Chief Justice WILLIAMS, for the Court.

On appeal from, *inter alia,* the trial justice's denial of their motion to dismiss, their renewed motion for judgment as a matter of law, and their alternative motion for a new trial, defendants, Millennium, NL, and Sherwin–Williams, argue that the trial justice erred by: (1) misapplying the law of public nuisance; (2) finding a causal connection between defendants' actions and lead poisoning in Rhode Island; and (3) failing to hold that this action is barred by the constitutional provision concerning separation of powers. In addition, defendants direct this Court's attention to a variety of alleged errors occurring at trial, some of which they contend amount to violations of both the United States and Rhode Island constitutions. For the reasons set forth herein, we reverse the judgment of the Superior Court as to the liability of defendants, Millennium, NL, and Sherwin–Williams, because we conclude that the trial justice erred by denying defendants' motion to dismiss. More specifically, we conclude that the state has not and cannot allege any set of facts to support its public nuisance claim that would establish that defendants interfered with a public right or that defendants were in control of the lead pigment they, or their predecessors, manufactured *at the time* it caused harm to Rhode Island children.

In reaching this conclusion, we do not mean to minimize the severity of the harm that thousands of children in Rhode Island have suffered as a result of lead poisoning. Our hearts go out to those children whose lives forever have been changed by the poisonous presence of lead. But, however grave the problem of lead poisoning is in Rhode Island, public nuisance law simply does not provide a remedy for this harm. The state has not and cannot allege facts that would fall within the parameters of what would constitute public nuisance under Rhode Island law. As set forth more thoroughly herein, defendants were not in control of any lead pigment at the time the lead caused harm to children in Rhode Island, making defendants unable to abate the alleged nuisance, the standard remedy in a public nuisance action. Furthermore, the General Assembly has recognized defendants' lack of control and inability to abate the alleged nuisance because it has placed the burden on landlords and prop-

erty owners to make their properties lead-safe.

■■■ This Court is bound by the law and can provide justice only to the extent that the law allows. Law consists for the most part of enactments that the General Assembly provides to us,[4] whereas justice extends farther. Justice is based on the relationship among people, but it must be based upon the rule of law. This Court is powerless to fashion independently a cause of action that would achieve the justice that these children deserve. United States Supreme Court Justice Benjamin N. Cardozo, a rightly revered student of the law, once summarized as follows the inherent limitations of the judicial role:

> "The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.'"

Benjamin N. Cardozo, *The Nature of the Judicial Process* 141 (1921) (quoting François Gény, Méthode d'Interprétation et Sources en droit privé positif, vol. II, p. 303, sec. 200, ed. 1919; transl. Modern Legal Philosophy Series).

Likewise, in the words of United States Supreme Court Chief Justice John G. Roberts, Jr., "judges must be constantly aware that their role, while important, is limited. They do not have a commission to solve society's problems, as they see them, but simply to decide cases before them according to the rule of law." John G. Roberts, Jr., *United States Senate Committee on the Judiciary Questionnaire* 66, http://www.nytimes.com/packages/pdf/politics/20050802roberts2.pdf) (August 2, 2005). In recognition of this philosophy, we consistently have adhered to "principles of judicial restraint [that] prevent [courts] from creating a cause of action for damages in all but the most extreme circumstances." *Bandoni v. State,* 715 A.2d 580, 595 (R.I.1998). Indeed, we long have held "that the creation of new causes of action is a legislative function." *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1226 (R.I.1996). After all, the judiciary's "duty [is] to determine the law, not to make the law." *City of Pawtucket v. Sundlun,* 662 A.2d 40, 57 (R.I.1995). "To do otherwise, even if based on sound policy and the best of intentions, would be to substitute our will for that of a body democratically elected by the citizens of this state and to overplay our proper role in the theater of Rhode Island government." *DeSantis v. Prelle,* 891 A.2d 873, 881 (R.I.2006).

# I

## Facts and Travel

It is undisputed that lead poisoning constitutes a public health crisis that has plagued and continues to plague this country, particularly its children. The General Assembly has declared that although "[c]hildhood lead poisoning is completely preventable," G.L. 1956 § 23–24.6–2(3), it is "the most severe environmental health problem in Rhode Island." Section 23–24.6–3. Indeed, Providence has received the unfavorable nickname "the lead paint capital" because of its disproportionately large number of children with elevated blood-lead levels. *Lead Industries Associ-*

---

4. Law consists not only of legislative enactments, but also of certain principles, norms, and causes of action that have evolved over centuries as "the common law."

*ation, Inc.*, 898 A.2d at 1235 (quoting Peter B. Lord, *Are lead-paint firms liable for damages?*, The Providence Journal, June 18, 1999, at A–1).

## A

## Dangers of Lead Poisoning

Lead is a toxic chemical that contributes to the "most common environmental disease of young children." Office of Lead–Based Paint Abatement and Poisoning Prevention, 61 Fed. Reg. 29170 (June 7, 1996) (quoting Strategic Plan for the Elimination of Lead Poisoning, Centers for Disease Control (CDC), U.S. Department of Health and Human Services, Atlanta, Georgia (1991)). There seems to be little public debate that exposure to lead can have a wide range of effects on a child's development and behavior. Contact with low levels of lead may lead to "permanent learning disabilities, reduced concentration and attentiveness and behavior problems, problems which may persist and adversely affect the child's chances for success in school and life." Section 23–24.6–2(1). The consequences are more injurious when children are exposed to higher lead levels. Office of Lead–Based Paint Abatement and Poisoning Prevention, 61 Fed. Reg. at 29170. Children exposed to elevated levels of lead can suffer from comas, convulsions, and even death. *Id.*

Lead was widely used in residential paints in the United States until the mid–1970s. *Id.* at 29171. There is no doubt that lead-based paint is the primary source of childhood lead exposure. *Id.* (citing Preventing Lead Poisoning in Young Children, CDC, U.S. Department of Health and Human Services, Atlanta, Georgia (1991) and Rabinowitz, M. et al., *Environmental Correlates of Infant Blood Lead Levels in Boston, Environmental Research* 38: 96–107 (1985). In the United States, children most often are lead-poisoned by ingesting lead paint chips from deteriorating walls or inhaling lead-contaminated surface dust. *Id.*

Children under six years of age are the most susceptible to lead poisoning for two primary reasons. First, children are more likely to encounter lead; young children spend a significant portion of their time on the floor, among the dust and chips of lead paint. Second, because they are young, children's growing bodies have a tendency to absorb more lead, and their brains and nervous systems are more sensitive to the lead.

Most lead pigment manufacturers belonged to the LIA as early as 1928, but the length of each company's membership varied considerably. Sherwin–Williams discontinued its membership in 1947, whereas Millennium remained a member until 1960, and NL remained a member until 1982. At trial, the state offered the minutes of a December 12, 1930, LIA board of directors meeting, containing a section titled "Lead Poisoning." The minutes refer to a discussion of recent news articles concerning the dangers of lead-based paint, including an article in the November 20, 1930, edition of The United States Daily, which reported: "Lead poisoning as a result of chewing paint from toys, cradles and woodwork is now regarded as a more frequent occurrence among children than formerly." *Lead-free paint on furniture and toys to protect children,* The United States Daily, Nov. 20, 1930. The minutes implied doubt about the extent of the problem, but demonstrated emerging knowledge of the problem within the industry.

## B

## Lead Poisoning in Rhode Island

Patricia A. Nolan, M.D., former director of the Rhode Island Department of Health (RIDOH), testified that from January 1993

to December 2004 at least 37,363 children in Rhode Island were poisoned by lead in paint. In 2004, a total of 1,685 children in Rhode Island were affected. Rhode Island Department of Health, *Childhood Lead Poisoning in Rhode Island: The Numbers 2005 Edition* 4, 19 (hereinafter *The Numbers 2005* ). Of this number, almost 70 percent of the children (1,167) were newly poisoned in 2004. *Id.* Fortunately, the prevalence of lead poisoning in children under the age of six recently has declined. *Id.* In 2005, RIDOH reported a 76 percent decline in the number of lead-poisoned children-from 20.5 percent in 1995 to 5 percent in 2004. *Id.* However, despite this significant decrease in childhood lead poisonings, the 5 percent prevalence rate is more than double the national average of 2.2 percent. *Id.*

## C

### Legislative Responses

In 1971, Congress recognized the prevalence of childhood lead poisonings and enacted chapter 63 of title 42 of the United States Code, the Lead–Based Paint Poisoning Prevention Act (LPPPA), a law aimed at studying the effects of childhood lead exposure and eliminating lead-based paint from federally owned or federally financed housing. Finally, in 1978, the Consumer Product Safety Commission banned the sale of residential paint containing more than 0.06 percent lead. *See* Ban of Lead–Containing Paint and Certain Consumer Products Bearing Lead–Containing Paints, 16 C.F.R. § 1303.1 (2008); *see also* Office of Lead–Based Paint Abatement and Poisoning Prevention, 61 Fed. Reg. at 29171.

Rhode Island, with a housing stock of older homes, also has recognized the depth of this problem.[5] In the early 1990s, the General Assembly began an investigation into childhood lead poisoning in Rhode Island. The General Assembly found that the "[e]nviromental exposure[ ] to even low levels of lead increase[s] a child's [health] risk," and that "[t]he most significant sources of environmental lead are lead-based paint in older housing and house dust and soil contaminated by this paint." Section 23–24.6–2(1), (2). It also found that "tens of thousands of Rhode Island's children are poisoned by lead at levels believed to be harmful," and that "[c]hildhood lead poisoning is dangerous to the public health, safety, and general welfare of the people and necessitates excessive and disproportionate expenditure of public funds for health care and special education, causing a drain upon public revenue." Section 23–24.6–2(4), (5).

In response to these findings, in 1991 (P.L. 1991, ch. 355, § 1), the General Assembly enacted the Lead Poisoning Prevention Act (LPPA), chapter 24.6 of title 23, which required RIDOH to implement various programs, including statewide blood-screening programs, lead-poisoning prevention programs, and educational programs. Section 23–24.6–5(a). The LPPA's stated purpose was to establish "a comprehensive program to reduce exposure to environmental lead and prevent childhood lead poisoning, the most severe environmental health problem in Rhode Island." Section 22–24.6–3.

To supplement this initiative, in 2002, the General Assembly later enacted the Lead Hazard Mitigation Act (LHMA) (P.L. 2002, ch. 187, § 3), G.L. 1956 chapter 128.1 of title 42, to help identify and correct lead hazards in this state. *See Mackie v. State,* 936 A.2d 588, 590 (R.I.2007). The LHMA imposed, *inter alia,* several

---

5. Patricia A. Nolan, M.D., estimated that at the time of trial, between 240,000 and 250,- 000 Rhode Island homes contained lead-based paint.

duties on the owners of rental dwellings that were constructed prior to 1978, which included correcting lead hazards on their premises. *Id.* (citing § 42–128.1–8(a)). This Court upheld challenged provisions of the LHMA in 2007. *Id.* at 597 (concluding that provisions of the LHMA were constitutional because "the General Assembly rationally could have concluded that the legislation was one step toward resolving the problem of lead poisoning of children in Rhode Island").

The General Assembly's programs for curtailing the incidence of lead poisoning in Rhode Island have been successful. Since the LPPA and LHMA have been in effect, Rhode Island has experienced a substantial decline in the number of lead-poisoned children. In 2004, Dr. Nolan acknowledged that since 1994, there has been a dramatic decrease in the incidence of lead poisoning among Rhode Island children. Rhode Island Department of Health, *Childhood Lead Poisoning in Rhode Island: The Numbers 2004 Edition* 1 (hereinafter *The Numbers 2004*). In fact, at trial, Dr. Nolan agreed that the progress has proven to be a "public health success story."

RIDOH reported, in 2004, a number of accomplishments, highlighting five programs in particular. RIDOH implemented the Lead Elimination Surveillance System database, which increased the efficiency of collecting and analyzing data. *The Numbers 2004* at 4. The Keep Your Baby Lead Safe program, an undertaking designed to reach pregnant women and facilitate access to a lead-safe home was enhanced, providing mothers-to-be with lead education as well as referrals to numerous community resources. *Id.* RIDOH also provided information and education to pregnant women, parents, physicians, and other professionals, enhanced case management through certified lead centers, and implemented the initial steps required by the LHMA. *Id.* at 4–5.

The General Assembly's approach to Rhode Island's lead paint problem and RIDOH's promulgation of regulations aimed at reducing lead hazards have proven effective and, as a result, the entire state—including its "core cities"[6]—has experienced substantial declines in lead poisoning. *The Numbers 2005* at 15.

### D

### Attorney General's Lawsuit

On October 12, 1999, the Attorney General, on behalf of the state filed a ten-count complaint against eight former lead pigment manufacturers, John Doe corporations, and the LIA.[7] The manufacturers were: NL, Sherwin–Williams, ARCO, The Glidden Company,[8] The O'Brien Corporation,[9] SCM Chemicals (SCM), American Cyanamid Company,[10] and E.I. Du Pont de

---

**6.** The municipalities described as "core cities" are Central Falls, Newport, Pawtucket, Providence, (the town of) West Warwick, and Woonsocket. Rhode Island Department of Health, *Childhood Lead Poisoning in Rhode Island: The Numbers 2005 Edition* 4, 15.

**7.** The Lead Industries Association (LIA) declared bankruptcy before the second trial of this case.

**8.** Millennium Inorganic Chemicals, Inc. later was added to the complaint as the successor to The Glidden Company's lead pigment busi-

ness. *See also infra* note 14 for the status of Millennium Inorganic Chemicals, Inc.

**9.** The O'Brien Corporation ultimately was dropped from this lawsuit.

**10.** The trial justice later granted American Cyanamid Company's motion to sever the state's claims against it from the primary trial. The trial justice explained that American Cyanamid, which had limited involvement with the LIA for a short period in the 1970s, might be prejudiced by proceeding to trial

Nemours and Company.[11] The state later amended its complaint to include the ConAgra Grocery Products Company.[12] A second-amended complaint added Cytec Industries, Inc.[13] and substituted Millennium Inorganic Chemicals, Inc. for SCM.[14]

The state alleged that the manufacturers or their predecessors-in-interest had manufactured, promoted, distributed, and sold lead pigment for use in residential paint, despite that they knew or should have known, since the early 1900s, that lead is hazardous to human health. The state also contended that the LIA was, in essence, a coconspirator or aider and abettor of one or more of the manufacturers from at least 1928 to the present. The state asserted that defendants failed to warn Rhode Islanders of the hazardous nature of lead and failed to adequately test lead pigment. In addition, the state maintained that defendants concealed these hazards from the public or misrepresented that they were safe. The state further alleged that defendants' actions caused it to incur substantial damages. As such, the state asserted, defendants were liable for public nuisance, violations of Rhode Island's Unfair Trade Practices and Consumer Protection Act, strict liability, negligence, negligent misrepresentation, fraudulent misrepresentation, civil conspiracy, unjust enrichment, and indemnity. The state also requested equitable relief to pro-

tect children in Rhode Island.[15] The state sought compensatory and punitive damages, in addition to an order requiring defendants to (1) abate lead pigment in all Rhode Island buildings accessible to children and (2) fund educational and lead-poisoning prevention programs.

In January 2000, defendants moved to dismiss all counts of the state's complaint pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure. With respect to the public nuisance claim, defendants asserted that they did not control the lead pigment at the time it caused harm to Rhode Island children and that, therefore, they cannot be held liable for public nuisance. The defendants also argued that there was no interference with a public right, as that term has been recognized under public nuisance law. For its part, however, the state countered that the public nuisance claim was proper because defendants could be held liable regardless of whether they currently control the lead-poisoned properties. The state urged that defendants' participation in the creation of the nuisance should subject them to liability. The trial justice, agreeing with the state, denied defendants' motion.

The trial justice dismissed several other counts and ordered that the case be tried in three phases. Eventually, only the state's public nuisance claim proceeded to

with other defendants that had experienced much greater involvement with the LIA.

11. E.I. Du Pont de Nemours and Company settled with the state before the second trial.

12. The trial court later dismissed the state's claim against ConAgra Grocery Products Company (ConAgra), finding that paint manufactured by the W.P. Fuller Paint Company, ConAgra's predecessor, or ConAgra was not present in Rhode Island.

13. Cytec Industries, Inc. ultimately was dropped from this lawsuit.

14. By stipulation of the state and Millennium Inorganic Chemicals, Inc. (Millennium Inorganic), on August 13, 2004, Millennium Holdings LLC was substituted for Millennium Inorganic as if Millennium Holdings LLC had been named as the defendant at the outset of this litigation. Millennium Inorganic was thereby dismissed without prejudice.

15. The state eliminated that count of its original complaint seeking equitable relief to protect children when it filed its second-amended complaint.

trial. After a seven-week trial, however, the jury was deadlocked and the trial justice declared a mistrial.

Before a second trial commenced, the state moved to strike defendants' demand for a jury trial, contending that its public nuisance claim was equitable in nature and that defendants had no right to a jury trial on that issue. At that time, the state voluntarily dismissed with prejudice all other non-equitable claims remaining in the case, including the following counts: strict liability, negligence, negligent misrepresentation, and fraudulent misrepresentation. The trial justice, however, denied the state's motion to strike the jury demand, concluding that the existence of a nuisance was a factual issue to be resolved by a jury and, further, that the state's demand for compensatory and punitive damages entitled defendants to a jury trial.

Before trial, the state moved *in limine* to exclude all evidence and testimony with respect to the presence or absence of lead paint in any individual Rhode Island property; the trial justice granted this motion. In so ruling, the trial justice noted that "property specific evidence is irrelevant in connection with the issue of whether the cumulative effect of such pigment in all such buildings * * * was a public nuisance * * *."

The defendants then moved for summary judgment with respect to the civil conspiracy count of the state's complaint. The trial justice granted defendants' motion, concluding that "civil conspiracy cannot stand in isolation," but rather, must be accompanied by an "underlying intentional tort theory." Because all the intentional tort theories had been dismissed, the trial justice concluded that it was proper to dismiss the civil conspiracy count as well.

The defendants also moved for summary judgment on the basis that the state could not identify any specific defendant whose lead pigment is present in any Rhode Island property. To support their motion, defendants relied primarily on this Court's decision in *Gorman v. Abbott Laboratories,* 599 A.2d 1364, 1364 (R.I.1991) (mem.), in which this Court rejected the market-share theory of products liability that the California Supreme Court had adopted. The trial justice denied defendants' motion, stating that product identification is not a necessary element in a public nuisance suit. Rather, the trial justice ruled that the state "need only show that each defendant (or such defendants as it seeks to hold liable for the public nuisance here claimed) has engaged in activities which were a substantial factor in bringing about the alleged public nuisance and the injuries and harm found to have been proximately caused thereby."

After these and other motions were dealt with, the second trial proceeded, this time against only four manufacturers—Millennium, NL, Sherwin–Williams, and ARCO.

At trial, the state presented witnesses who offered historical evidence about the use of lead pigment in paint, the impact of childhood lead poisoning on Rhode Island, and defendants' conduct concerning lead pigment in paint.

After the state rested, defendants moved immediately for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure. Their primary contention was that the state had failed to prove a sufficient nexus between defendants' activities and the presence of lead pigment in Rhode Island. After hearing the arguments of counsel, the trial justice granted defendants' motion with respect to the state's indemnification and unjust enrichment claims and its request for compensatory damages. The court reserved judgment, however, on whether the state had proven a sufficient

nexus between defendants' activities and the presence of lead pigment in Rhode Island.

The trial justice provided the jury with the law applicable to the case and instructed the jury to apply that law to the facts as it found them based on the evidence presented. First, the trial justice explained that the jury was being asked to determine "whether the cumulative presence of lead pigment in paints and coatings in or on buildings throughout the state of Rhode Island constitutes a public nuisance." He defined public nuisance as "something that unreasonably interferes with a right common to the general public. It is something that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." He further explained that the right common to the general public is collective in nature and belongs to the community at large. The trial justice then clarified that "an interference is an injury, invasion, disruption, or obstruction of a right held by the general public." He added that an interference "is unreasonable when persons have suffered harm or are threatened with injuries that they ought not have to bear."

After providing the jury with a definition of public nuisance and detailing the elements, the trial justice also told the jury that if it found that a public nuisance exists, it then must determine whether defendants' actions were the proximate cause of the nuisance. He defined proximate cause as "a cause that in a natural, continuous, and unbroken sequence produces an event or injury and without which the event or injury would not have occurred."

Lastly, the trial justice instructed the jury that if it concluded that the cumulative presence of lead pigment in paint is a public nuisance and that defendants are liable, it then must decide whether any defendants should abate the public nuisance. The trial justice provided the jury with written copies of the instructions.

The jury began deliberations on February 14, 2006, and returned its verdict on February 22, 2006; it found that the "cumulative presence of lead pigment in paints and coatings on buildings throughout the State of Rhode Island" constituted a public nuisance. The jury further found that defendants, Millennium, NL, and Sherwin–Williams, were liable for causing or substantially contributing to the creation of the public nuisance. Lastly, the jury concluded that those three defendants "should be ordered to abate the public nuisance." The jury found that a fourth defendant, ARCO, was not liable.

After the verdict, defendants renewed their motions for judgment as a matter of law pursuant to Rule 50 and moved alternatively for a new trial pursuant to Rule 59 of the Superior Court Rules of Civil Procedure. The trial justice denied both these motions. While these motions were pending, defendant Sherwin–Williams filed with the Superior Court supplemental motions pursuant to Rules 26(e), 59, 60(b)(2), and 60(b)(3) of the Superior Court Rules of Civil Procedure; defendants Millennium and NL joined in these motions. Again, the trial justice denied all of these motions.

On March 16, 2007, the court entered a judgment of abatement in favor of the state against defendants, Millennium, NL, and Sherwin–Williams, from which they appeal.

Additional facts will be provided as necessary.

## II

### Analysis

#### A

##### Standard of Review

■ When reviewing a trial justice's decision on a Rule 12(b)(6) motion to dis-

miss, this Court applies the same standards as the trial justice and, accordingly, "must assume that the allegations contained in the complaint are true, and examine the facts in the light most favorable to the nonmoving party." *A.F. Lusi Construction, Inc. v. Rhode Island Convention Center Authority*, 934 A.2d 791, 795 (R.I. 2007) (internal quotation marks omitted). Like the trial justice, we will "examine the complaint to determine if plaintiffs are entitled to relief under any conceivable set of facts." *Id.*

## B

## Public Nuisance

 The defendants first argue that the trial justice erred in refusing to dismiss the public nuisance count set forth in the state's complaint. They also argue that the trial justice erred in denying their motion for judgment as a matter of law. The defendants contend that the public nuisance claim should have been dismissed at the outset—or, at the very least, that judgment as a matter of law should have been entered in their favor because suppliers of lead pigment cannot be held liable under a public nuisance theory for harm resulting from lead-based paint in Rhode Island. In addition, defendants argue that the trial justice erred when he instructed the jury on the law of public nuisance. We agree with defendants that the public nuisance claim should have been dismissed at the outset because the state has not and cannot allege that defendants' conduct interfered with a public right or that defendants were in control of lead pigment at the time it caused harm to children in Rhode Island. We reach this conclusion with a keen realization of how limited the judicial system often is. We believe that the following recent observation by this Court in another case is equally applicable to this case:

"The American judicial system as it exists today is admirable: it is the product of many decades of fine-tuning of an already excellent substantive and procedural construct which this country took with it when it parted ways with England. Nevertheless, our judicial system is not a panacea that can satisfy everyone who has recourse to it. Some wrongs and injuries do not lend themselves to *full* redressment by the judicial system." *Ryan v. Roman Catholic Bishop of Providence*, 941 A.2d 174, 188 (R.I.2008).

## 1

## History of Public Nuisance

The definition of public nuisance and the description of the elements comprising this cause of action have been developed and refined by this Court over the years. Mindful of the admonition of United States Supreme Court Justice Oliver Wendell Holmes, Jr. that "[i]n order to know what [the law] is, we must know what it has been, and what it tends to become" as that is "necessary to the knowledge of what the law is," we begin our analysis by retracing the history of public nuisance at common law. Oliver Wendell Holmes, Jr., *The Common Law* 1, 37 (Dover ed., General Publishing Co., Ltd., 1991) (1881).

Today, public nuisance and private nuisance are separate and distinct causes of action, but both torts are inextricably linked by their joint origin as a common writ, dating to twelfth-century English common law. *See* Richard O. Faulk and John S. Gray, *Alchemy in the Courtroom? The Transmutation of Public Nuisance Litigation*, 2007 Mich. St. L. Rev. 941, 951 (2007) (citing C.H.S. Fifoot, *History and Sources of the Common Law: Tort and Contract* 3–5 (1949)); Donald G. Gifford, *Public Nuisance as a Mass Products Lia-*

*bility Tort*, 71 U. Cin. L. Rev. 741, 790–91, 794 (2003)). In its earliest form, nuisance was a criminal writ used to prosecute individuals or require abatement of activities considered to "be *'nocumentum iniuriousum propter communem et publicam utiliatem '*—a nuisance by reason of the common and public welfare." Gifford, 71 U. Cin. L. Rev. at 793–94 (citing Henry de Bracton, 3 *Bracton on the Laws and Customs of England* 191, f. 232b (Samuel E. Thorne ed., 1977)). Public nuisance, or common nuisance as it originally was called, was "an infringement of the rights of the Crown." 4 Restatement (Second) *Torts* § 821B, cmt. *a* at 87 (1979). Although the earliest cases involved encroachments on the royal domain, public nuisance law evolved to include "the invasion of the rights of the public." *Id.*

By the fourteenth century, courts began to apply public nuisance principles to protect rights common to the public, including "roadway safety, air and water pollution, disorderly conduct, and public health * * *." Faulk & Gray, 2007 Mich. St. L. Rev. at 951. Nuisance became a "flexible judicial remedy" that allowed courts to address conflicts between land use and social welfare at a time when government regulations had not yet made their debut. *Id.*

It was not until the sixteenth century that the crime of public nuisance largely was transformed into the tort that is familiar in our courts today. Faulk & Gray, 2007 Mich. St. L. Rev. at 952. However, additional parameters were necessary to limit the reach of the new tort. A private party seeking to bring a public nuisance claim was required to demonstrate that he or she had "suffered a 'particular' or 'special' injury that was not common to the public." *Id.; see also* 4 Restatement (Second) *Torts* § 821B, cmt. *a* at 87–88 (explaining that public nuisance had remained

a crime until the sixteenth century, when it first was determined that a private individual, suffering a particularized harm different in kind from that suffered by the public, had the right, in tort, to recover damages for his injury).

Ultimately, "[a]t common law public nuisance came to cover a large, miscellaneous and diversified group of minor offenses * * *." 4 Restatement (Second) *Torts* § 821B, cmt. *b* at 40. Notably, all these offenses involved an "interference with the interests of the community at large—interests that were recognized as rights of the general public entitled to protection." *Id.*

Public nuisance as it existed in English common law made its way to Colonial America without change. Faulk & Gray, 2007 Mich. St. L. Rev. at 953. In time, public nuisance became better known as a tort, and its criminal counterpart began to fade away in American jurisprudence. As state legislatures started enacting statutes prohibiting particular conduct and setting forth criminal penalties there was little need for the broad, vague, and anachronistic crime of nuisance. 4 Restatement (Second) *Torts* § 821B, cmt. *c* at 88.

The criminal origins of public nuisance in Rhode Island still can be found in statutes designating certain criminal activities and the places in which they are conducted as "common nuisances." *See, e.g.,* G.L. 1956 § 11–30–2 (defining the unlicensed manufacture or distribution of intoxicating liquor as a common nuisance); § 11–30–12 (defining slaughterhouses, rendering plants, garbage plants, and brick kilns as common nuisances if located within 300 feet of any public park or public hospital); § 11–30–13 (defining the burning of decaying and waste substances as a nuisance); G.L. 1956 § 21–28–4.06 (defining certain facilities used in the distribution of illegal drugs as common nuisances); G.L. 1956

§ 41–5–20 (defining unauthorized boxing matches as common nuisances).

## 2

## Public Nuisance in Rhode Island

As the law of public nuisance began to take hold in Rhode Island, it reflected the principle "so long ago laid down by Lord Holt, that 'in every case where a statute enacts or prohibits a thing for the benefit of a person, he shall have a remedy upon the same statute for the thing enacted for his advantage, or for the recompense of the wrong done to him contrary to the said law.'" *Aldrich v. Howard*, 7 R.I. 199, 213 (1862) (quoting *Couch v. Steel*, 3 Ellis and Blackburn, (77 Eng. C.L.R.) 411). Some of Rhode Island's earliest cases involved activities designated as "common nuisances" by the General Assembly. Those cases recognized that "'a public nuisance becomes a private one to him who is specially and in some particular way inconvenienced thereby * * *.'" *State v. Keeran*, 5 R.I. 497, 511 (1858). *See also State v. Paul*, 5 R.I. 185, 194 (1858) (an action for abatement of a public nuisance may be brought "by those who are specially injured or obstructed").

In Rhode Island, actions to abate public nuisances originally were brought in the form of an indictment. *Keeran*, 5 R.I. at 511; *Paul*, 5 R.I. at 194. Today, the state Attorney General is empowered to bring actions to abate public nuisances. *See* G.L. 1956 § 42–9–2 (vesting the Attorney General with the power to commence a public nuisance suit) and G.L. 1956 § 10–1–1 (providing that "[w]henever a nuisance is alleged to exist, the attorney general

* * * may bring an action in the name of the state * * * to abate the nuisance").

▮▮▮ Public nuisance long has been recognized as a legally viable cause of action in Rhode Island. *See J.S. Thornton & Co. v. Smith Grant & Co.*, 10 R.I. 477, 483 (1873) ("The law [of public nuisance] as declared in the English cases has been recognized by the courts of this country * * *."). Over centuries, this Court has taken careful steps to refine the common law definition of public nuisance to reflect societal changes. We are cognizant of the fact that the common law is a knowable judicial corpus and, as such, serves the important social value of stability; although the common law does evolve, that evolution takes place gradually and incrementally and usually in a direction that can be predicted. *See Wheaton v. Peters*, 33 U.S. (8 Peters) 591, 671, 8 L.Ed. 1055 (1834) ("[a] great proportion of the rules and maxims which constitute the immense code of the common law, grew into use by gradual adoption"); *see also* John T. Loughran, *Some Reflections on the Role of Judicial Precedent*, 22 Fordham L. Rev. 1, 3 (1953) (noting that "[t]he common law has been able to maintain its preeminent place over the centuries because of its stability and its inherent capacity for keeping pace with the demands of an ever-changing and ever-growing civilization"). In so evolving, the law reflects, *inter alia*, the "felt necessities of the time, the prevalent moral and political theories, [and the] intuitions of public policy * * *." Holmes, *The Common Law* at 1. Although we recognize the need for such incremental changes,[16] like most courts, we are "partic-

---

16. *See In re Lead Paint Litigation*, 191 N.J. 405, 924 A.2d 484, 506 (2007) (Zazzali, C.J., dissenting) (positing that courts have "a duty to reconcile outdated formulations of the common law with the complexities of contemporary society. * * * [As such,] [t]he com-

mon law must 'stand ready to adapt as appropriate, to shape, redress, and remedy so as to answer measure for measure the particular evil it pursues.'") (quoting *Tachiona v. Mugabe*, 169 F.Supp.2d 259, 318 (S.D.N.Y.2001),

ularly loath to indulge in the abrupt abandonment of settled principles and distinctions that have been carefully developed over the years." Loughran, 22 Fordham L. Rev. at 8.

■ This Court has defined public nuisance as "an unreasonable interference with a right common to the general public." *Citizens for Preservation of Waterman Lake v. Davis*, 420 A.2d 53, 59 (R.I. 1980). *See also Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.*, 640 A.2d 950, 957 (R.I.1994). "[I]t is behavior that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." *Citizens for Preservation of Waterman Lake*, 420 A.2d at 59 (citing *Copart Industries, Inc. v. Consolidated Edison Company of New York*, 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968, 971 (1977)). Put another way, "public nuisance is an act or omission which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all." *Iafrate v. Ramsden*, 96 R.I. 216, 222, 190 A.2d 473, 476 (1963) (citing Prosser, *Torts*, ch. 14, § 71 at 401 (2d ed. 1955)).

Although this Court previously has not had the opportunity to address all the elements of public nuisance, to the extent that we have addressed this common law cause of action, our definition largely is consistent with that of many other jurisdictions, the Restatement (Second) of Torts, and several scholarly commentators.

The Restatement (Second) defines public nuisance, in relevant part, as follows:

"(1) A public nuisance is an unreasonable interference with a right common to the general public.

"(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

"(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience * * *." 4 Restatement (Second) *Torts* § 821B at 87.

The Supreme Court of New Jersey, considering facts that were virtually identical to those in this case, elaborated on the necessary elements to maintain a public nuisance action. In that case, the New Jersey court held:

"First, a public nuisance, by definition, is related to conduct, performed in a location within the actor's control, which has an adverse effect on a common right. Second, a private party who has suffered special injury may seek to recover damages to the extent of the special injury and, by extension, may also seek to abate. Third, a public entity which proceeds against the one in control of the nuisance may only seek to abate, at the expense of the one in control of the nuisance. These time-honored elements of the tort of public nuisance must be our guide in our consideration of whether these complaints have stated such a claim." *In re Lead Paint Litigation*, 191 N.J. 405, 924 A.2d 484, 499 (2007).

This Court recognizes three principal elements that are essential to establish public nuisance: (1) an unreasonable interference; (2) with a right common to the general public; (3) by a person or people with control over the instrumentality alleged to have created the nuisance when the damage occurred. After establishing the presence of the three elements of public nuisance, one must then determine whether the defendant caused the public

*rev'd on other grounds*, 386 F.3d 205 (2d Cir. 2004)).

nuisance. We will address each element in turn.

### i

### Unreasonable Interference

▮▮▮▮ Whether an interference with a public right is unreasonable will depend upon the activity in question and the magnitude of the interference it creates. Activities carried out in violation of state laws or local ordinances generally have been considered unreasonable *if they interfere with a public right*. *See, e.g., Pucci v. Algiere*, 106 R.I. 411, 426–27, 261 A.2d 1, 10 (1970) (dilapidated structure in violation of local ordinance); *Aldrich*, 7 R.I. at 213–14 (wooden building in violation of state statute). Activities that do not violate the law but that nonetheless create a substantial and continuing interference with a public right also generally have been considered unreasonable. *See, e.g., Wood v. Picillo*, 443 A.2d 1244, 1245–48 (R.I.1982) (chemical dump that emitted noxious odors and eventually caught fire, causing multiple explosions and groundwater contamination); *Lapre v. Kane*, 69 R.I. 504, 507–09, 36 A.2d 92, 94–95 (1944) (swine operation that emitted noxious odors and required that large quantities of "swill" be transported and dumped onto property); *Braun v. Iannotti*, 54 R.I. 469, 469–70, 175 A. 656, 657 (1934) (greenhouse that continually emitted smoke); *Blomen v. N. Barstow Co.*, 35 R.I. 198, 199–200, 211, 85 A. 924, 924–25 (1913) ("drop or hammer" that caused noise and vibration that could be felt at some distance). The plaintiff bears the burden of showing that a legal activity is unreasonable. *Citizens for Preservation of Waterman Lake*, 420 A.2d at 59.

In public nuisance law, as in other areas of the law, what is reasonable *vel non* is not determined by a simple formula. *Cf., e.g., State v. Thomas*, 936 A.2d 1278, 1284 (R.I.2007) (in the Fourth Amendment context reasonableness is determined "in light of the facts and circumstances confronting [the officer]") (quoting *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *State v. Quinlan*, 921 A.2d 96, 108 (R.I.2007) (in the search and seizure context "[t]he question of reasonableness is fact specific"); *In re Diamond Y.*, 915 A.2d 1283, 1287 (R.I.2007) (in the parental rights context "[the] reasonableness determination is made on a case-by-case basis").

### ii

### Public Right

▮▮▮ A respected legal authority has identified "[t]he interference with a public right [as] the *sine qua non* of a cause of action for public nuisance." 58 Am.Jur.2d *Nuisances* § 39 at 598–99 (2002) (emphasis added). This Court also has emphasized the requirement that "the nuisance must affect an interest common to the general public, rather than peculiar to one individual, or several." *Iafrate*, 96 R.I. at 222, 190 A.2d at 476 (quoting Prosser, *Torts*, ch. 14, § 72 at 402). *See also Hydro–Manufacturing, Inc.*, 640 A.2d at 957 ("public nuisance is an 'unreasonable interference with a right common to the general public' "); *Citizens for Preservation of Waterman Lake*, 420 A.2d at 59 ("A public nuisance is an unreasonable interference with a right common to the general public * * *."); *Lapre*, 69 R.I. at 509, 36 A.2d at 95 (an "injury to the public generally" may constitute a public nuisance); *Narragansett Real Estate Co. v. Mackenzie*, 34 R.I. 103, 123, 82 A. 804, 810–11 (1912) (explaining that a public nuisance would require interference with the public's right to navigate public waterways). This is not to say that public nuisance only is actionable if it occurs on public property. Rather, public nuisance is actionable even when the nuisance itself is present on private property,

so long as the alleged nuisance *affects* the rights of the general public. *See, e.g., Braun,* 54 R.I. at 469–70, 175 A. at 657 (greenhouse on private property could constitute a public nuisance). *See also City of Chicago v. American Cyanamid Co.,* 355 Ill.App.3d 209, 291 Ill.Dec. 116, 823 N.E.2d 126, 132 (2005) ("A public nuisance is actionable even where the nuisance is present on private property.").

The Restatement (Second) provides further assistance in defining a public right. "A public right is *one common to all members of the general public.* It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured. Thus the pollution of a stream that merely deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land does not for that reason alone become a public nuisance. If, however, the pollution prevents the use of a public bathing beach or kills the fish in a navigable stream and so deprives all members of the community of the right to fish, it becomes a public nuisance." 4 Restatement (Second) *Torts* § 821B, cmt. *g* at 92 (emphasis added).

 Indeed, the Connecticut Supreme Court has explained that "[t]he test is not the number of persons annoyed, but the possibility of annoyance to the public by the invasion of its rights. A public nuisance is one that injures the citizens generally who may be so circumstanced as to come within its influence." *Higgins v. Connecticut Light & Power Co.,* 129 Conn. 606, 30 A.2d 388, 391 (1943) (quoting *Nolan v. New Britain,* 69 Conn. 668, 38 A. 703, 706 (1897)). As the Restatement (Second) makes clear, a public right is more than an aggregate of private rights by a large number of injured people. *See* Restatement (Second) *Torts* § 821B, cmt.

*g* at 92; *see also American Cyanamid Co.,* 291 Ill.Dec. 116, 823 N.E.2d at 131 (a public right is not "an assortment of claimed private individual rights"). Rather, a public right is the right to a public good, such as "an indivisible resource shared by the public at large, like air, water, or public rights of way." *American Cyanamid Co.,* 291 Ill.Dec. 116, 823 N.E.2d at 131. Unlike an interference with a public resource,

"[t]he manufacture and distribution of products rarely, if ever, causes a violation of a public right as that term has been understood in the law of public nuisance. Products generally are purchased and used by individual consumers, and any harm they cause—even if the use of the product is widespread and the manufacturer's or distributor's conduct is unreasonable—is not an actionable violation of a public right. * * * The sheer number of violations does not transform the harm from individual injury to communal injury." Gifford, 71 U. Cin. L. Rev. at 817.

Professor Donald G. Gifford of the University of Maryland School of Law explained the essential nature of a public right by contrasting it with a public interest:

"That which might benefit (or harm) 'the public interest' is a far broader category than that which actually violates 'a public right.' For example, while promoting the economy may be in the public interest, there is no public right to a certain standard of living (or even a private right to hold a job). Similarly, while it is in the public interest to promote the health and well-being of citizens generally, there is no common law public right to a certain standard of medical care or housing." Gifford, 71 U. Cin. L. Rev. at 815.

### iii

### Control

■ As an additional prerequisite to the imposition of liability for public nuisance, a defendant must have *control* over the instrumentality causing the alleged nuisance *at the time the damage occurs.* Put simply, "[o]ne who controls a nuisance is liable for damages caused by that nuisance." *Friends of the Sakonnet v. Dutra,* 749 F.Supp. 381, 395 (D.R.I.1990) (*Dutra II*) (applying Rhode Island law); *see also Citizens for Preservation of Waterman Lake,* 420 A.2d at 59 (declining to impose liability for public nuisance when plaintiff "failed to produce any evidence directly bearing on the amount of noise created by trucks *under [defendant's] control*") (emphasis added).

Thus, liability in a public nuisance action "turns on whether the defendants were in control over the instrumentality alleged to constitute the nuisance, either through ownership or otherwise." *City of Manchester v. National Gypsum Co.,* 637 F.Supp. 646, 656 (D.R.I.1986) (applying New Hampshire law). Importantly, the defendant must have had control over the nuisance-causing instrumentality at the time that the damage occurred. *Friends of the Sakonnet v. Dutra,* 738 F.Supp. 623, 633–34 (D.R.I.1990) (*Dutra I*) (citing *National Gypsum Co.,* 637 F.Supp. at 656).

Indeed, control at the time the damage occurs is critical in public nuisance cases, especially because the principal remedy for the harm caused by the nuisance is abatement. *See* § 10–1–1 (authorizing the Attorney General to bring an action to abate a public nuisance); *State ex rel. Dresser Industries, Inc. v. Ruddy,* 592 S.W.2d 789, 793 (Mo.1980) ("Injunctions or abatements have been the traditional remedies where the state brings suit for a public nuisance * * *."); *see also National Gypsum Co.,* 637 F.Supp. at 656 ("The defendants, after the time of manufacture and sale, no longer had the power to abate the nuisance. Therefore, a basic element of the tort of nuisance is absent, and the plaintiff cannot succeed on this theory of relief."); *Town of Hooksett School District v. W.R. Grace & Co.,* 617 F.Supp. 126, 133 (D.N.H.1984) (recognizing that the defendant manufacturer was unable to "abate or relieve the complaint of nuisance, a hallmark of the cases listed in New Hampshire," and, therefore, lacked the element of control necessary to be held liable for public nuisance).

The party in control of the instrumentality causing the alleged nuisance is best positioned to abate it and, therefore, is legally responsible. Gifford, 71 U. Cin. L. Rev. at 820 ("[L]iability for nuisance—both public and private—is premised not on the creation of a nuisance but rather on the defendant's current control of the instrumentality causing the nuisance."); Mark P. Gagliardi, Note, *Stirring up the Debate in Rhode Island: Should Lead Paint Manufacturers Be Held Liable for the Harm Caused by Lead Paint?,* 7 Roger Williams U. L. Rev. 341, 376 (2002) ("[T]he [s]tate fails to take into account that there must be some control over the *instrumentality* alleged to have created the nuisance.").

Recently, the New Jersey Supreme Court similarly held that control at the time the damage occurs is a time-honored element of public nuisance. *In re Lead Paint Litigation,* 924 A.2d at 499. In ruling that the manufacturers of lead pigment could not be held liable for nuisance under New Jersey law, the high court of that state emphasized that "a public nuisance, by definition, is related to conduct, performed in a location within the actor's control * * *." *Id.*

The New Jersey decision was not without dissent, however. The Chief Justice

concluded that control over the nuisance is not a necessary element at common law. *In re Lead Paint Litigation,* 924 A.2d at 510 (Zazzali, C.J., dissenting). He agreed with other courts that have said it is enough that the defendants contributed to the creation of the unreasonable interference and it is immaterial whether the defendants continued to exercise control over the nuisance. *Id.*

As support, the Chief Justice cited the decision of the United States District Court for the District of Rhode Island in *Dutra I,* 738 F.Supp. at 633, for the proposition that Rhode Island has not yet barred recovery of nuisance damages if the defendant no longer controls the nuisance. *In re Lead Paint Litigation,* 924 A.2d at 510. However, apparently the Chief Justice did not read far enough; the fact is that the federal District Court continued as follows: "The paramount question is whether the defendant was in control of the instrumentality alleged to have created the nuisance *when the damage occurred.*" *Dutra I,* 738 F.Supp. at 633–34. (Emphasis added.) In other words, although defendants need not control the nuisance at all times, they must have, minimally, controlled the nuisance at the time of the damage.

Lending further credence to this principle, the federal District Court clarified its *Dutra I* holding later that same year. *See Dutra II,* 749 F.Supp. at 395. The court, again applying Rhode Island law, stated that "liability * * * under the law of nuisance depends primarily on the question of control and duty * * *." *Id.* "One who controls a nuisance is liable for damages caused by that nuisance." *Id.*

Other courts and commentators likewise have emphasized the element of control. A leading treatise concerning products liability law states that "a product which has caused injury cannot be classified as a nuisance to hold liable the manufacturer or seller for the product's injurious effects * * *." 2 *American Law of Products Liability* § 27:6 at 11 (3d 2006). Indeed, "a product manufacturer who builds and sells the product and does not control the enterprise in which the product is used is not in the situation of one who creates a nuisance * * *." *Id.; see also City of Bloomington, Indiana v. Westinghouse Electric Corp.,* 891 F.2d 611, 614 (7th Cir.1989) (noting the absence of cases "holding manufacturers liable for public or private nuisance claims arising from the use of their product subsequent to the point of sale"); Gifford, 71 U. Cin. L. Rev. at 820 ("The essence of public nuisance law * * * is ending the harmful conduct. This is impossible for the manufacturer or distributor who has relinquished possession by selling or otherwise distributing the product."); Victor E. Schwartz & Phil Goldberg, *The Law of Public Nuisance: Maintaining Rational Boundaries on a Rational Tort,* 45 Washburn L.J. 541, 568 (2006) ("[F]urnishing a product or instrumentality—whether it be chemicals, asbestos, guns, lead paint, or other products—is not the same as having control over that instrumentality.").

## iv

## Causation

■ The party alleging the existence of a public nuisance not only must demonstrate the existence of the nuisance, but also must demonstrate "that injury has been caused by the nuisance complained of." *Citizens for Preservation of Waterman Lake,* 420 A.2d at 59 (citing *McClellan v. Thompson,* 114 R.I. 334, 344, 333 A.2d 424, 429 (1975)). Causation is a basic requirement in any public nuisance action; such a requirement is consistent with the law of torts generally. *See Contois v. Town of West Warwick,* 865 A.2d 1019,

1023 (R.I.2004) (discussing the causation requirement in negligence actions); *Clift v. Vose Hardware, Inc.*, 848 A.2d 1130, 1132 (R.I.2004) (discussing the causation requirement in the products liability context); *Salk v. Alpine Ski Shop, Inc.*, 115 R.I. 309, 314–15, 342 A.2d 622, 626 (1975) (concluding that, even under strict liability, a plaintiff must show "a causal connection between the defect and the injury").

A defendant will be held liable in public nuisance only if the conduct complained of actually *caused* an interference with a public right. *See Wood*, 443 A.2d at 1248 ("The testimony * * * clearly establishes that [the] defendants' dumping operations have already caused substantial injury * * *."); *Rose v. Standard Oil Company of New York, Inc.*, 56 R.I. 272, 279, 185 A. 251, 254 (1936) (discussing "the chain of causation"); *Sweet v. Conley*, 20 R.I. 381, 385, 39 A. 326, 328 (1898) (liability for a public nuisance is appropriate when defendant "wrongfully and illegally cause[d] the surface water of a street to collect and remain in front of one's premises"). Although it is true that public nuisance is characterized by an unreasonable interference with a public right, basic fairness dictates that a defendant must have caused the interference to be held liable for its abatement. *See Citizens for Preservation of Waterman Lake*, 420 A.2d at 60 (holding that the defendant was not liable when "there [was] virtually no evidence establishing that such odors were caused by any actions on the part of [the] defendant").

■■■ In addition to proving that a defendant is the cause-in-fact of an injury, a plaintiff must demonstrate proximate causation. *See DiPetrillo v. The Dow Chemical Co.*, 729 A.2d 677, 692–93 (R.I. 1999) (affirming that the jury be instructed on both "but for" and proximate causation in the products liability context); *Moretti v. C.S. Realty Co.*, 78 R.I. 341, 353, 82 A.2d

608, 615 (1951) (instructing on proximate cause in nuisance case). Proximate cause is a more exacting standard than simple "but for" causation. *Tavares v. Aramark Corp.*, 841 A.2d 1124, 1128 (R.I.2004). A leading treatise speaks as follows about proximate cause:

"As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 41 at 264 (5th ed. 1984).

We agree with the Illinois Supreme Court that "[t]he proper inquiry regarding legal cause involves an assessment of foreseeability, in which we ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct." *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill.2d 351, 290 Ill.Dec. 525, 821 N.E.2d 1099, 1127 (2004) (citing *Lee v. Chicago Transit Authority*, 152 Ill.2d 432, 178 Ill. Dec. 699, 605 N.E.2d 493, 503 (1992)).

■■■ Accordingly, "[l]iability cannot be predicated on a prior and remote cause which merely furnishes the condition or occasion for an injury resulting from an intervening unrelated and efficient cause, even though the injury would not have resulted but for such a condition or occasion * * *." *Clements v. Tashjoin*, 92 R.I. 308, 314, 168 A.2d 472, 475 (1961) (citing 65 C.J.S. *Negligence* § 111d at 693). A plaintiff "need not exclude every other possible cause," but a plaintiff must demonstrate proximate cause by "reasonable inferences drawn from the facts in evidence." *Skaling v. Aetna Insurance Co.*, 742 A.2d 282, 288 (R.I.1999) (quoting *Cartier v. State*, 420 A.2d 843, 848 (R.I.1980)).

## V
### Another Attribute of Public Nuisance

In concluding this discussion of the elements necessary to establish a public nuisance, we also believe that it is advisable to mention the following.

A common feature of public nuisance is the occurrence of a dangerous condition at a specific location. This Court has recognized that the existence of a nuisance depends in large part on its location, and, to date, the actions for nuisance in this jurisdiction have been related to *land. See, e.g., Wood*, 443 A.2d at 1245–46 (dump site on the defendant's property). In fact, in *O'Reilly v. Perkins*, this Court sustained the trial court's dismissal of the plaintiffs' complaint in which they had failed to identify the location of their property in relation to the defendant's proposed brewery. *O'Reilly v. Perkins*, 22 R.I. 364, 364–65, 48 A. 6, 6 (1901). *See also State v. Beardsley*, 108 Iowa 396, 79 N.W. 138, 141 (Iowa 1899) ("[A] nuisance is the unlawful use of one's own property, working an injury to a right of another or of the public, and producing such inconvenience, discomfort, or hurt that the law will presume a consequent damage."); *In re Lead Paint Litigation*, 924 A.2d at 495 ("[P]ublic nuisance has historically been tied to conduct on one's own land or property as it affects the rights of the general public.").

The United States Supreme Court has remarked that "the question [of] whether * * * a particular thing is a nuisance, is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (citing *Sturgis v. Bridgeman*, L.R. 11 Ch. 852, 865). Professor William L. Prosser, the highly respected authority on the law of torts, remarked

that "[i]f 'nuisance' is to have any meaning at all, it is necessary to dismiss a considerable number of cases which have applied the term to matters not connected either with land or with any public right, as mere aberration * * *." *Prosser and Keeton on the Law of Torts*, § 86 at 618; *see also City of San Diego v. U.S. Gypsum*, 30 Cal.App.4th 575, 35 Cal.Rptr.2d 876, 883 (1995).

 Unlike private nuisance, public nuisance does not necessarily involve an interference with a particular *individual's* use and enjoyment of his or her land. *In re Lead Paint Litigation*, 924 A.2d at 495–96 (citing 4 Restatement (Second) *Torts* § 821B, cmt. *h* at 93). Rather, public nuisance typically arises on a defendant's land and interferes with a public right. *Id.* at 496 (citing 4 Restatement (Second) *Torts* § 821B, cmt. *g* at 92). For example, a nuisance may originate on a defendant's land as in the case of a mosquito pond, or an activity conducted on a defendant's land may interfere with a right of the general public, as in a stream-polluting business. *Id.* at 495.

## 3
### Whether the Presence of Lead Paint Constitutes a Public Nuisance

 After thoroughly reviewing the complaint filed by the state in this case, we are of the opinion that the trial justice erred in denying defendants' motion to dismiss under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure.

As the foregoing analysis demonstrates, under Rhode Island law, a complaint for public nuisance minimally must allege: (1) an unreasonable interference; (2) with a right common to the general public; (3) by a person or people with control over the instrumentality alleged to have created the

nuisance when the damage occurred; and (4) causation.

Even considering the allegations of fact as set forth in the complaint, we cannot ascertain allegations in the complaint that support each of these elements. The state's complaint alleges simply that "[d]efendants created an environmental hazard that continues and will continue to unreasonably interfere with the health, safety, peace, comfort or convenience of the residents of the [s]tate, thereby constituting a public nuisance." Absent from the state's complaint is any allegation that defendants have interfered with a public right as that term long has been understood in the law of public nuisance. Equally problematic is the absence of any allegation that defendants had control over the lead pigment at the time it caused harm to children.

At the motion to dismiss stage, defendants argued that "the [s]tate has not asserted a public nuisance claim because a public right has not been infringed and because the defendants' lead did not cause the alleged harm while within their control as product manufacturers or promoters." The defendants also argued that the state's complaint did not seek to enjoin those people who were responsible for maintaining the public nuisance. For its part, the state argued that the public's right to be free from the hazards of unabated lead had been infringed and that defendants were responsible for the presence of lead in public and private properties throughout Rhode Island. After considering both these arguments, the trial justice denied defendants' motion to dismiss, concluding that the state had sufficiently averred that defendants' conduct "unreasonably interfered with the health, safety, peace, comfort or convenience of the general community." We disagree.

A necessary element of public nuisance is an interference with a public right—those indivisible resources shared by the public at large, such as air, water, or public rights of way. The interference must deprive all members of the community of a right to some resource to which they otherwise are entitled. *See* 4 Restatement (Second) *Torts* § 821B, cmt. *g* at 92. The Restatement (Second) provides much guidance in ascertaining the fine distinction between a public right and an aggregation of private rights. "Conduct does not become a public nuisance merely because it interferes with the use and enjoyment of land by a large number of persons." *Id.* *See also City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 116 (Mo. 2007) (quoting *State ex inf. Ashcroft v. Kansas City Firefighters Local No. 42*, 672 S.W.2d 99, 114–15 (Mo.Ct.App.1984)); *In re Lead Paint Litigation*, 924 A.2d at 501.

Although the state asserts that the public's right to be free from the hazards of unabated lead had been infringed, this contention falls far short of alleging an interference with a public right as that term traditionally has been understood in the law of public nuisance. The state's allegation that defendants have interfered with the "health, safety, peace, comfort or convenience of the residents of the [s]tate" standing alone does not constitute an allegation of interference with a public right. *See Beretta U.S.A. Corp.*, 290 Ill.Dec. 525, 821 N.E.2d at 1114. The term public right is reserved more appropriately for those indivisible resources shared by the public at large, such as air, water, or public rights of way. *See American Cyanamid Co.*, 291 Ill.Dec. 116, 823 N.E.2d at 131, 139 (persuaded by the defendants' argument to this effect). Expanding the definition of public right based on the allegations in the complaint would be antithetical to the common law and would lead to a widespread expansion of public nuisance law that never was intended, as we discuss *infra*. In

declining to adopt such a widespread expansion of the law, we are mindful of the words of Edmund Burke that "bad laws are the worst sort of tyranny." 1 Edmund Burke, *The Works of Edmund Burke: With a Memoir* 318 (1860).

The right of an individual child not to be poisoned by lead paint is strikingly similar to other examples of nonpublic rights cited by courts, the Restatement (Second), and several leading commentators. *See Beretta U.S.A. Corp.*, 290 Ill.Dec. 525, 821 N.E.2d at 1114 (concluding that there is no public right to be "free from unreasonable jeopardy to health, welfare, and safety, and from unreasonable threats of danger to person and property, caused by the presence of illegal weapons in the city of Chicago"); 4 Restatement (Second) *Torts* § 821B, cmt. *g* at 92 (the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured is not a public right); Gifford, 71 U. Cin. L. Rev. at 815 (there is no common law public right to a certain standard of living, to a certain standard of medical care, or to a certain standard of housing).

■■■ In the words of one commentator: "Despite the tragic nature of the child's illness, the exposure to lead-based paint usually occurs within the most private and intimate of surroundings, his or her own home. Injuries occurring in this context do not resemble the rights traditionally understood as public rights for public nuisance purposes—obstruction of highways and waterways, or pollution of air or navigable streams." Gifford, 71 U. Cin. L. Rev. at 818.

The enormous leap that the state urges us to take is wholly inconsistent with the widely recognized principle that the evolution of the common law should occur gradually, predictably, and incrementally. Were we to hold otherwise, we would change the meaning of public right to encompass all behavior that causes a widespread interference with the private rights of numerous individuals.

The Illinois Supreme Court recently hypothesized on the effect of a broader recognition of public right. In *Beretta*, the Illinois Supreme Court considered whether there was a public right to be "free from unreasonable jeopardy to health, welfare, and safety, and from unreasonable threats of danger to person and property, caused by the presence of illegal weapons in the city of Chicago." *Beretta U.S.A. Corp.*, 290 Ill.Dec. 525, 821 N.E.2d at 1114. In concluding that there was not, the court acknowledged the far-reaching effects of a decision otherwise. *Id.* 290 Ill.Dec. 525, 821 N.E.2d at 1116. The court speculated that

"[i]f there is public right to be free from the threat that others may use a lawful product to break the law, that right would include the right to drive upon the highways, free from the risk of injury posed by drunk drivers. This public right to safe passage on the highways would provide the basis for public nuisance claims against brewers and distillers, distributing companies, and proprietors of bars, taverns, liquor stores, and restaurants with liquor licenses, all of whom could be said to contribute to an interference with the public right." *Id.*

In taking the analogy a step further, the court considered the effect of other product misuse, stating:

"Similarly, cell phones, DVD players, and other lawful products may be misused by drivers, creating a risk of harm to others. In an increasing number of jurisdictions, state legislatures have acted to ban the use of these otherwise legal products while driving. A public right to be free from the threat that other drivers may defy these laws would permit nuisance liability to be imposed

on an endless list of manufacturers, distributors, and retailers of manufactured products that are intended to be, or are likely to be, used by drivers, distracting them and causing injury to others." *Id.* Like the *Beretta* court, we see no reason to depart from the long-standing principle that a public right is a right of the public to shared resources such as air, water, or public rights of way.

 Even had the state adequately alleged an interference with a right common to the general public, which we conclude it did not, the state's complaint also fails to allege any facts that would support a conclusion that defendants were in control of the lead pigment at the time it harmed Rhode Island's children.

The state filed suit against defendants in their capacity "either as the manufacturer of* * * lead pigment * * * or as the successors in interest to such manufacturers" for "the cumulative presence of lead pigment in paints and coatings in or on buildings throughout the [s]tate of Rhode Island." For the alleged public nuisance to be actionable, the state would have had to assert that defendants not only manufactured the lead pigment but also controlled that pigment at the time it caused injury to children in Rhode Island—and there is no allegation of such control.

The New Jersey Supreme Court applied these same elements to the lead paint litigation in that jurisdiction and likewise held that public nuisance was an improper cause of action. The court emphasized that were it "to permit these complaints to proceed, [it] would stretch the concept of public nuisance far beyond recognition and would create a new and entirely unbounded tort antithetical to the meaning and inherent theoretical limitations of the tort of public nuisance." *In re Lead Paint Litigation,* 924 A.2d at 494. We agree.

We conclude, therefore, that there was no set of facts alleged in the state's complaint that, even if proven, could have demonstrated that defendants' conduct, however unreasonable, interfered with a public right or that defendants had control over the product causing the alleged nuisance at the time children were injured. Accordingly, we need not decide whether defendants' conduct was unreasonable or whether defendants caused an injury to children in Rhode Island.

In denying defendants' motion to dismiss, the highly respected trial justice, however well intentioned, departed from the traditional requirements of common law public nuisance. The Restatement (Second) warns against any such departure from the common law, noting that "[i]f a defendant's conduct in interfering with a public right does not come within one of the traditional categories of the common law crime of public nuisance or is not prohibited by a legislative act, the court is acting without an established and recognized standard." 4 Restatement (Second) *Torts,* § 821B, cmt. *e* at 90. We pause, however, to acknowledge the complexity of the issues presented in this case[17] and to note that, in reversing the judgment of the Superior Court, we mean no disrespect to the distinguished trial justice, the jury, the

---

17. The tort of public nuisance has been described as "at least contested, and perhaps confused beyond repair," Louise A. Halper, *Untangling the Nuisance Knot,* 26 B.C. Envtl. Aff. L. Rev. 89, 96 (1998) and as an "impenetrable jungle," W. Page Keeton et al., *Handbook of the Law of Torts,* ch. 15, § 86 at 616 (5th ed. 1984). It has been said that "[nuisance] has meant all things to all people, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie. There is general agreement that it is incapable of any exact or comprehensive definition." W. Page Keeton et al., ch. 15, § 86 at 616.

members of our judiciary, the trial lawyers, or the Office of the Attorney General—all of whom labored for years over this formidable and problematic case.

Finally, our decision that defendants' conduct does not constitute a public nuisance as that term has for centuries been understood in Anglo–American law does not leave Rhode Islanders without a remedy. For example, an injunction requiring abatement may be sought against landlords who allow lead paint on their property to decay. See, e.g., Pine v. Kalian, 723 A.2d 804, 804–05 (R.I.1998) (mem.) (upholding the Superior Court's grant of an injunction requiring that two landlords abate the lead hazard in their property). In addition, the LPPA provides for penalties and fines against those property owners who violate its rules or procedures. Sections 23–24.6–23 and 23–24.6–27. The LHMA further authorizes a private cause of action to be brought on behalf of households with at-risk occupants to seek injunctive relief to compel property owners to comply with the act. G.L. 1956 § 42–128.1–10.

■ Apart from these actions, the proper means of commencing a lawsuit against a manufacturer of lead pigments for the sale of an unsafe product is a products liability action. The law of public nuisance never before has been applied to products, however harmful. Courts in other states consistently have rejected product-based public nuisance suits against lead pigment manufacturers, expressing a concern that allowing such a lawsuit would circumvent the basic requirements of products liability law. See American Cyanamid Co., 291 Ill.Dec. 116, 823 N.E.2d at 134; Benjamin Moore & Co., 226 S.W.3d at 116; In re Lead Paint Litigation, 924 A.2d at 503–05.

Public nuisance focuses on the abatement of annoying or bothersome activities.

Products liability law, on the other hand, has its own well-defined structure, which is designed specifically to hold manufacturers liable for harmful products that the manufacturers have caused to enter the stream of commerce.

Undoubtedly, public nuisance and products liability are two distinct causes of action, each with rational boundaries that are not intended to overlap. In 1971, this Court adopted the doctrine of strict liability for products as set forth in the Restatement (Second) Torts. See Ritter v. Narragansett Electric Co., 109 R.I. 176, 192, 283 A.2d 255, 263 (1971) ("It is our conclusion, then, that the rule stated in § 402A of the Restatement (Second) of Torts may be invoked in cases of products liability in appropriate cases."). We require two elements: "(1) 'the seller is engaged in the business of selling such a product,' and (2) the product 'is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.'" Olshansky v. Rehrig International, 872 A.2d 282, 287 (R.I.2005) (quoting Ritter, 109 R.I. at 188, 283 A.2d at 261). These two elements are crucial for the imposition of liability in a products liability suit, yet neither element is a requirement of public nuisance.

A product-based public nuisance cause of action bears a close resemblance to a products liability action, yet it is not limited by the strict requirements that surround a products liability action. Courts presented with product-based public nuisance claims have expressed their concern over the ease with which a plaintiff could bring what properly would be characterized as a products liability suit under the guise of product-based public nuisance. The New Jersey Supreme Court, in rejecting the public nuisance claims against lead pigment manufacturers wrote that "[w]e cannot help but agree with the observation

that, were we to find a cause of action here, 'nuisance law would become a monster that would devour in one gulp the entire law of tort.'" *In re Lead Paint Litigation*, 924 A.2d at 505 (quoting *Camden County Board of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir.2001)); *see also U.S. Gypsum*, 35 Cal.Rptr.2d at 883 ("[N]uisance cases 'universally' concern the use or condition of property, not products.") (quoting *Detroit Board of Education v. Celotex Corp.*, 196 Mich.App. 694, 493 N.W.2d 513, 521 (1992)).

■ Other courts have rendered similar rulings. In *Benjamin Moore & Co.*, the Missouri Supreme Court held that the city's public nuisance claim with respect to lead paint in buildings must be dismissed because the city could not identify the specific products used in the buildings. *Benjamin Moore & Co.*, 226 S.W.3d at 113, 116. Likewise, the Illinois Appellate Court rejected Chicago's assertion that public nuisance claims do not require identification of the product as being that of the defendant. *American Cyanamid Co.*, 291 Ill.Dec. 116, 823 N.E.2d at 139–40. These cases demonstrate that even if a lawsuit is characterized as a public nuisance cause of action, the suit nonetheless sounds in products liability if it is against a manufacturer based on harm caused by its products. Regardless of the label placed on the cause of action, the elements of products liability still must be met to properly maintain such a product-based proceeding.

It is essential that these two causes of action remain just that—two separate and distinct causes of action. Addressing this distinction and the danger of a product-based public nuisance suit against gun manufacturers, wholesalers, and retailers, a New York appellate court explained that

"giving a green light to a common-law public nuisance cause of action today will * * * likely open the courthouse doors to a flood of limitless, similar theories of public nuisance, not only against these defendants, but also against a wide and varied array of other commercial and manufacturing enterprises and activities." *People v. Sturm, Ruger & Co., Inc.*, 309 A.D.2d 91, 761 N.Y.S.2d 192, 196 (N.Y.App.Div.2003).

"All a creative mind would need to do is construct a scenario describing a known or perceived harm of a sort that can somehow be said to relate back to the way a company or an industry makes, markets and/or sells its non-defective, lawful product or service, and a public nuisance claim would be conceived and a lawsuit born." *Id.*

The Rhode Island General Assembly has recognized that lead paint has created a public health hazard and, pursuant to its power to legislate, has adopted several statutory schemes to address this problem. Collectively, the LPPA and the LHMA reflect the General Assembly's chosen means of responding to the state's childhood lead poisoning problem. The legislative body made clear policy decisions about how to reduce lead hazards in Rhode Island homes, buildings, and other dwellings and who should be responsible. Importantly, the General Assembly has recognized that landlords, who are in control of the lead pigment at the time it becomes hazardous, are responsible for maintaining their premises and ensuring that the premises are lead-safe. Quite tellingly, the General Assembly's chosen means of remedying childhood lead poisoning in Rhode Island did not include an authorization of an action for public nuisance against the manufacturers of lead pigments, despite the fact that this action seeking to impose liability on various lead pigment manufacturers was well under

way at the time the LHMA was enacted. Indeed, even the trial justice recognized the absence of legislation governing defendants' actions. He found the LPPA inapplicable because it does not "address in any fashion the actions of these defendants" and because "[t]he statutes and regulations do not authorize the existence of the claimed public nuisance." By focusing on the party in control of the instrumentality at the time the harm occurs, the General Assembly's enactments are wholly consistent with the law of public nuisance in this state and all other jurisdictions.

### Conclusion

For the foregoing reasons, we conclude that the trial justice erred in denying defendants' motion to dismiss.

### Track II

### Compensatory Damages

### Chief Justice WILLIAMS, for the Court.

Also before this Court is the state's cross-appeal on the issue of compensatory damages. The state argues that it was improper for the trial justice to dismiss the state's claim for damages in excess of $26 million. The state also contends that it was improper for the trial justice to foreclose it from presenting evidence to the jury on the amount of money expended on publicly financed programs, which, the state alleges, was directly caused by the public nuisance from lead in paint. Because we conclude that the tort of public nuisance was not the proper cause of action to proceed against defendant lead pigment manufacturers, we need not address the state's argument with respect to compensatory damages.

### Track III

### The State's Appeal Concerning ARCO's Successorship Liability

### Justice SUTTELL, for the Court.

The state has appealed from the trial justice's grant of a judgment as a matter of law under Super.R.Civ.P. 50 in favor of ARCO on the ground that ARCO was not the legal successor to the Anaconda Lead Products Company (ALPC), a manufacturer of white lead carbonate between 1920 and 1936. ARCO also has filed a conditional cross-appeal if this Court reverses the trial justice's decision.

In its complaint, the state alleged that ARCO was "the successor-in-interest to International Smelting and Refining Company [IS & R] and [ALPC]." At trial, the state and ARCO stipulated that ALPC produced lead pigment at an East Chicago, Indiana, plant from 1920 to 1936, when the company was dissolved and its assets and properties were transferred to its parent, IS & R. IS & R produced lead pigment at the same East Chicago plant from 1936 until 1946. In 1973, IS & R merged into its parent company, The Anaconda Company, and in 1977 ARCO acquired all shares of stock in The Anaconda Company. On December 31, 1981, The Anaconda Company was merged into ARCO.

After granting ARCO's Rule 50 motion, the trial justice instructed the jury that ARCO was not liable for the acts or omissions of ALPC. The jury thus considered ARCO's potential liability only with respect to its successorship to IS & R for the manufacturing and promotion of lead pigment from 1936 to 1946. The jury eventually returned a verdict in favor of ARCO, finding that ARCO had not "caused or substantially contributed to the creation of the public nuisance."

The state now seeks a new trial against ARCO, asserting that the trial justice misapplied the applicable Rhode Island law on successor liability, as set forth in the seminal case of *H.J. Baker & Bro., Inc. v. Orgonics, Inc.*, 554 A.2d 196 (R.I.1989). In addition, the state urges us to adopt the

"de facto merger" exception to the general rule that "a company that purchases the assets of another is not liable for the debts of the transferor company." *Id.* at 205 (citing *Cranston Dressed Meat Co. v. Packers Outlet Co.*, 57 R.I. 345, 348, 190 A. 29, 31 (1937)). Because we conclude in Track I of this opinion that the trial justice erred in denying defendants' motion to dismiss under Super.R.Civ.P. 12(b)(6), we need not address either the state's arguments about ARCO's liability or ARCO's conditional cross-appeal.

## Track IV

## The Trial Court's Contempt Findings

## I

## Facts and Travel

## Justice FLAHERTY, for the Court.

In this heated and contentious legal dispute, the trial justice continually was challenged to bring order inside and outside of the courtroom in an effort to maintain a setting that would ensure a fair trial to both sides. An example of the tense litigation atmosphere emerged shortly before jury selection, when the trial justice granted defendant Millennium's motion to compel discovery about a settlement agreement negotiated with a former defendant, DuPont, pursuant to which DuPont was dismissed from the case with prejudice. Reporting on this agreement, The Providence Journal quoted Patrick Lynch, the Rhode Island Attorney General, as saying, "Du Pont stepped up to the plate. It was willing to do something about the children." Then, referring to counsel for the other defendants, the Attorney General was reported to have said: "This discovery is just part of the despicable legal moves the company lawyers are willing to make to slow down justice."

Understandably concerned about this type of extrajudicial trial publicity, the trial justice conducted an in camera hearing on October 21, 2005. At that hearing, defendants Millennium and Sherwin–Williams asked the trial justice to direct the Attorney General to refrain from making public statements that attacked the credibility of defendants or their counsel,[18] citing Article V, Rule 3.6 of the Supreme Court Rules of Professional Conduct.[19]

---

18. Soon after, Millennium also filed a motion for both severance and a continuance. Millennium argued that the Attorney General's comments in the above-cited Providence Journal article prevented it from receiving a fair trial. Sherwin–Williams also filed a similar motion, citing various articles and arguing that the Attorney General's statements undermined its right to an impartial jury. The trial justice denied both motions.

19. At the time, Article V, Rule 3.6 of the Supreme Court Rules of Professional Conduct said in full:

"(a) A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding.

"(b) A statement referred to in paragraph (a) ordinarily is likely to have such an effect when it refers to a civil matter triable to a jury, a criminal matter, or any other proceeding that could result in incarceration, and the statement relates to:

"(1) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness;

"(2) in a criminal case or proceeding that could result in incarceration, the possibility of a plea of guilty to the offense or the existence or contents of any confession, admission, or statement given by a defendant or suspect or that person's refusal or failure to make a statement;

"(3) the performance or results of any examination or test or the refusal or failure to a person to submit to an examination or test, or

During the hearing, counsel for the state reported to the trial justice that he had spoken with the Attorney General and that the Attorney General "clearly understood the importance of not getting into subjective comments" as the case moved forward. The trial justice then issued a sealed oral order that required that the Attorney General conform his public statements to Rule 3.6. This was followed by a sealed written order on November 3, 2005, which provided in relevant part:

> "1. The Court directs the Attorney General to fully comply with Rule 3.6 of the Rhode Island Rules of Professional Conduct with respect to any and all statements the Attorney General may make, release or cause to be released to the public, individually or through his office, which pertain in whole or in part to this case, any of the parties to this case, or the subject-matter of this case."

The Attorney General did not object to the validity of this order at that time nor did he seek any clarification with respect to its language.

the identity or nature of physical evidence expected to be presented;

"(4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration;

"(5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial; or

"(6) the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

"(c) Notwithstanding paragraphs (a) and (b)(1–5), a lawyer involved in the investigation or litigation of a matter may state without elaboration:

"(1) the general nature of the claim or defense;

"(2) the information contained in a public record;

## A

## The Trial Court's November 2005 Contempt Finding

The trial progressed, but unfortunately that did nothing to cool the heated emotions surrounding the case. On November 16, 2005, the Attorney General left the courtroom after a day of trial, and he responded to a variety of questions from the press. A Providence Journal article later characterized the Attorney General's statements:

> "Following the ruling, Campbell [a spokesperson for defendants] had no comment. But a beaming Lynch stepped outside the courtroom and praised [trial justice Michael A.] Silverstein for the way he has guided the case during the last six years. He also lambasted the defense.
>
> "'We want to continue our search for justice before this jury and not give in to those who would spin and twist the facts,' Lynch said."

"(3) that an investigation of the matter is in progress, including the general scope of the investigation, the offense or claim or defense involved and, except when prohibited by law, the identity of the persons involved;

"(4) the scheduling or result of any step in litigation;

"(5) a request for assistance in obtaining evidence and information necessary thereto;

"(6) a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interests; and

"(7) in a criminal case:

"(i) the identity, residence, occupation and family status of the accused;

"(ii) if the accused has not been apprehended, information necessary to aid in apprehension of that person;

"(iii) the fact, time and place of arrest; and

"(iv) the identity of investigating and arresting officers or agencies and the length of the investigation."

Alarmed by these reported comments, the trial justice called a *sua sponte* hearing the next day to address the Attorney General's remark, and he asked the parties to file any papers that they thought were appropriate. Millennium then moved for an order to declare the Attorney General in civil contempt of the order of November 3, 2005, and it also asked the court to dismiss the action as a sanction; defendants ARCO, NL, and Sherwin–Williams joined Millennium's motion. The defendants argued that the Attorney General's public comments were part of a pattern of public attacks upon the character and credibility of defendants. The Attorney General countered that his statements were justified and that they did not violate the Supreme Court Rules of Professional Conduct.

At a contempt hearing conducted on November 18, 2005, the Attorney General personally addressed the court and he explained his comments. It is noteworthy that at this time, the Attorney General again raised no objection to the November order; rather, he conceded its propriety: "So, that your order in response to the issuance of me commenting or excusing that word ['despicable'] is more than appropriate, and I recognize that fully." Explaining his comments, the Attorney General said that reporters asked him: "What do you have to say about [defendants'] claims that your counsel have flagrantly disregarded the law, have violated ethical rules intentionally?" The Attorney General told the court that he declined to respond to these statements. However, the reporters pressed, asking him, "Well, what

do you have to say about them saying that your team has continuously and intentionally * * * flagrantly disregarded the rules, particularly the ethical rules of conduct?" The Attorney General said that he finally responded by saying simply: "What is printed in the paper that I will not respond to is the spinning and twisting of evidence and comments like that you just attached to those people."

On November 28, 2005, after considering the written arguments submitted by the parties and the Attorney General's comments, the trial justice issued a bench decision, finding the Attorney General in civil contempt of the court's order of November 3, 2005.[20] Although he did not elaborate on his findings, the trial justice noted that the Attorney General had been goaded by reporters and that he did not willfully violate the court's order. The trial justice's contempt finding was memorialized in an order on December 6, 2005,[21] which directed the Attorney General to pay the clerk of the Providence County Superior Court $5,000 as a sanction.

**B**

**The Trial Court's May 2006 Contempt Finding**

In his December 6, 2005 order, the trial justice did more than find the Attorney General in contempt—he amended his original November order by adding paragraph 1.1, which said: "The Court directs the Attorney General to cease and desist from making any subjective characterizations of the defendants or any of them or of their agents, servants or attorneys."

---

**20.** The Attorney General immediately moved for a stay of the court's imposition of sanctions so he could appeal the contempt finding, which the trial justice agreed to do. The Attorney General then filed a notice of appeal and he asked this Court to seal the notice, the relevant docket sheet, and all pleadings and

submissions filed in connection with the contempt appeal. The Attorney General, however, apparently later abandoned the appeal.

**21.** The trial justice sealed this order as well as the contempt-hearing transcript.

Soon after, on February 22, 2006,[22] the trial justice again cautioned the parties: "I don't want any discussion with this jury by anyone with respect to what motivated them to reach the decision that they did or anything else about the case."

Nonetheless, further problems arose on February 22, 2006. Apparently flushed with victory, just after the jury returned a verdict on liability in favor of the state, the Attorney General posted a statement on his official website that thanked the jurors "for their service, their attention to the facts and evidence that led them to this moment, and their courage in rendering a historic verdict that, ultimately, will help make Rhode Island a safer and better place to live." Matters were complicated further when, on the following day, The Boston Globe published this quote from the Attorney General: "The companies failed to step up and clean up the problem they created * * *. The legal process has held them accountable and said you can't duck and run.

Because of the Attorney General's "duck and run" comment and the website posting, defendants Millennium, Sherwin-Williams, and NL asked the trial justice again to find the Attorney General in civil contempt. Specifically, defendants asserted that labeling them as "duck and run" defendants violated the November order, as amended on December 6, 2005. They also argued that the Attorney General's praise of the jurors, who had not been discharged and had yet to deliberate on the punitive damage and remediation-plan issues, was an improper attempt to influence the panel. This, they alleged, violat-

ed Article V, Rule 3.5 of the Supreme Court Rules of Professional Conduct,[23] as well as the trial court's bench order of February 22, 2006. The defendants asserted that a second monetary sanction would be no more effective than the first, and that the appropriate sanction was dismissal of the punitive-damage claim. In response, the Attorney General continued to deny any impropriety; he asserted that his "duck and run" comment did not violate Rule 3.6 and that his comments to the jurors "were not designed to say anything" to them.

At a hearing on May 1, 2006, the trial justice again held the Attorney General in civil contempt for violating the Rules of Professional Conduct and the Superior Court's prior orders, noting that "[t]his Court has no hesitancy in holding as I now do that the Attorney General is in further contempt." The trial justice scheduled another hearing to determine the resulting sanctions. At this hearing, defendants asserted that the Attorney General's continued misconduct warranted dismissal of the equitable abatement remedy sought by the state. The Attorney General, in turn, urged against the imposition of sanctions, arguing that the December order was constitutionally infirm because it was too vague to inform the parties as to what expression actually was prohibited.

The trial justice memorialized his bench decision of May 1, 2006 in a written order on June 2, 2006, specifically finding the Attorney General in civil contempt of the November order, as amended on December 6, 2005, and, apparently, the court's

22. At this time, the jury had returned a verdict in favor of the state, but had not determined punitive damages.

23. Because Article V, Rule 3.5 of the Supreme Court Rules of Professional Conduct never

was incorporated into an order, the trial justice did not and could not have found the Attorney General in contempt for violating that rule.

directive of February 22, 2006.[24] The trial justice denied defendants' request for sanctions and he also denied the Attorney General's request to defer imposing a sanction until an appeal had been heard. Instead, the trial justice ordered that the Attorney General personally pay the clerk of the Providence County Superior Court $10,000, in addition to the previously imposed $5,000 sanction.[25]

## C

### The Attorney General's Appeal to this Court

On June 5, 2006, the state and the Attorney General appealed the trial justice's findings of contempt and his imposition of sanctions.[26] They then asked this Court to stay paragraph 1.1 of the Superior Court's December order. We agreed to do so on June 15, 2006, although we emphasized that the trial court's order directing the Attorney General to comply with Rule 3.6 remained in full effect.

In its appeal, the state refutes the trial justice's findings of contempt, asserting that the Attorney General had a common-law privilege and a duty as a constitutional officer to comment on this case because it was a matter of public importance. Further, the state argues that the trial justice's application of Rule 3.6 to the Attorney General was unconstitutional because it violated his First Amendment rights and that, in any event, the "spin and twist" comment did not violate the rule because no reasonable attorney would have believed that there was a substantial likelihood that the statement would prejudice the pending trial. The state also contends that paragraph 1.1 of the December order was unconstitutionally vague and overbroad, and that the Attorney General's website posting did not violate any of the Superior Court's prohibitions. Finally, the state argues that the penalties imposed by the trial justice were excessive.

The defendants counter that (1) the trial justice's orders were necessary to protect their right to a fair trial, (2) the state waived its rights, under the collateral-bar doctrine, to challenge the enforceability of the Superior Court's orders,[27] (3) the Attorney General was not exempt from Rule 3.6, which strikes an appropriate balance between his First Amendment rights and defendants' right to a fair trial, (4) the trial justice's findings of contempt were neither clearly wrong nor arbitrary, (5) the monetary sanctions imposed were within the broad discretion of the trial court,[28] and (6) the Attorney General's comments were not "core political speech" protected by the First Amendment.

24. Although neither the bench decision nor the subsequent written order referred to the trial justice's February 22, 2006 warning to the parties to avoid "discussion" with the jury, the trial justice's contempt finding based on the Attorney General's website posting undeniably rested in part on that directive.

25. The trial justice again granted a stay of the sanctions to permit the Attorney General to seek appellate review.

26. For ease of reference, we will refer to plaintiffs, who appealed the contempt findings and sanctions, as either the Attorney General or state.

27. In jurisdictions in which it is recognized, the collateral-bar doctrine prohibits a party from questioning the validity of an underlying order for the first time in a contempt hearing. Because we reverse the trial justice's findings of contempt and vacate the imposition of sanctions, however, we do not need to address this argument. We express no view on whether the collateral-bar doctrine should be recognized in this jurisdiction.

28. Again, because we vacate the imposition of sanctions, we do not address the propriety of the amount of those sanctions.

■ After considering the record, the briefs submitted by the parties, and the oral arguments of counsel, we respectfully disagree with the trial justice's findings of contempt. With regard to the first contempt finding, irrespective of whether the November order meets constitutional muster and was enforceable,[29] we nonetheless do not believe the Attorney General's "spin and twist" comment violated that order. We also disagree with the second finding of contempt because (1) we do not believe the December order was enforceable against the Attorney General and (2) we do not think the Attorney General's official website posting violated any directive from the trial court. For these reasons, we reverse the Superior Court's findings of contempt and we vacate all related sanctions.

## II

### Analysis

#### A

#### Standard of Review

■ "A finding of contempt is within the sound discretion of the trial justice." *Durfee v. Ocean State Steel, Inc.*, 636 A.2d 698, 704 (R.I.1994) (citing *Brierly v. Brierly*, 431 A.2d 410, 412 (R.I.1981)). Factual findings at a contempt hearing "will not be disturbed unless they are clearly wrong or the trial justice abused his or her discretion." *Id.* "A complaining party can establish civil contempt on behalf of his opponent when there is clear and convincing evidence that a lawful decree has been violated." *Nardone v. Ritacco*, 936 A.2d 200, 204 (R.I.2007) (quoting *Direct Action*

29. The state argues on appeal that the November order was unenforceable, asserting that the order was an unconstitutional prior restraint on expression and was not sufficiently clear. Because this Court will not decide a case on constitutional grounds when it otherwise can be decided, *see Caron v. Town of*

*for Rights and Equality v. Gannon*, 819 A.2d 651, 661 (R.I.2003)).

■ We apply a *de novo* standard of review, however, to questions of law, as well as to mixed questions of fact and law that purportedly implicate a constitutional right. *See Foley v. Osborne Court Condominium*, 724 A.2d 436, 439 (R.I.1999) (citing *State v. Campbell*, 691 A.2d 564, 569 (R.I.1997)). Thus, in cases raising First Amendment challenges, we " 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

#### B

#### Contempt Finding Based on the "Spin and Twist" Comment

■ Based on the "spin and twist" comment he made to the media on November 16, 2005, the trial justice found the Attorney General in contempt of the court's November order, which required that the Attorney General abide by Rule 3.6. After careful review, we hold that irrespective of the validity and enforceability of that order, the Attorney General's "spin and twist" comment did not violate its provisions. Therefore, we reverse the trial justice's first finding of contempt and vacate the sanction imposed.

*North Smithfield*, 885 A.2d 1163, 1165 (R.I. 2005) (mem.); *In re Court Order Dated October 22, 2003*, 886 A.2d 342, 350 n. 7 (R.I. 2005); *Amico's Inc. v. Mattos*, 789 A.2d 899, 909 (R.I.2002), and because we find that there was no violation of the November order, we need not address these arguments.

### 1
### Constitutionality, Clarity, and Specificity of the November Order

■ To be enforceable, a court order such as the one at issue here must pass constitutional muster, as it implicates the Attorney General's First Amendment rights, and it also must be sufficiently clear to put the effected parties on notice of the order's proscriptions. A prior restraint is "a predetermined judicial prohibition restraining specified expression." *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 248 (7th Cir.1975). "Although the 'guarantees of freedom of expression are not an absolute prohibition under all circumstances, * * * the barriers to prior restraint remain high and the presumption against its use continues intact.'" *In re Court Order Dated October 22, 2003*, 886 A.2d 342, 350 (R.I.2005) (quoting *Nebraska Press Association v. Stuart*, 427 U.S. 539, 570, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)). "[P]rior restraint on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Id.* at 350–51.

■ Although not unconstitutional *per se*, any prior restraint on expression bears a heavy presumption against its validity. *See Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). To withstand constitutional scrutiny, a court's restrictive order "must fit within one of the narrowly defined exceptions to the prohibition against prior restraints." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (citing *Bantam Books, Inc.*, 372 U.S. at 71, 83 S.Ct. 631). Courts have permitted some restrictions on speech when disclosure of information concerning pending litigation by the parties or their counsel would threaten a litigant's right to a fair trial. *See, e.g., Bauer*, 522 F.2d at 248. The United States Supreme Court specifically has held that a lawyer's free expression may be limited to the extent that the speech presents a "substantial likelihood of materially prejudic[ing]" a fair trial. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1063, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (Rehnquist, C.J., joined by White, Scalia, and Souter, JJ.); *see id.* at 1082, 111 S.Ct. 2720 (O'Connor, J., concurring) ("I agree with [the Chief Justice] that the 'substantial likelihood of material prejudice' standard * * * passes constitutional muster.").[30]

■ To be the basis of a contempt finding, the court's November order also must be sufficiently clear. "A civil contempt proceeding is an appropriate vehicle to enforce compliance with court orders and decrees when attempting to preserve and enforce the rights of [the parties]." *Trahan v. Trahan*, 455 A.2d 1307, 1311 (R.I.1983). It is well settled that for a restraining order to be enforceable by contempt proceedings, it "should be clear and certain and its terms should be sufficient to enable one reading the writ or order to learn therefrom what he may or may not do thereunder." *Ventures Management*

---

**30.** It should be noted, however, that a majority of the *Gentile* Court said that the disputed Nevada rule was void for vagueness based on a safe-harbor provision. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (Kennedy, J., joined by Marshall, Blackmun, Stevens, and O'Connor, JJ.) Although a similar safe-harbor provision is present in Rule 3.6(c), this subsection is not at issue in this case; the Attorney General has not cited or relied upon Rule 3.6(c), and he does not argue on appeal that any of his challenged public statements are protected by that provision.

*Co. v. Geruso,* 434 A.2d 252, 254 (R.I.1981) (quoting *Sunbeam Corp. v. Ross–Simons, Inc.,* 86 R.I. 189, 194, 134 A.2d 160, 162 (1957)). Furthermore, "[t]he terms of the order should be specific, clear and precise so that one need not resort to inference or implications to ascertain his duty or obligation thereunder." *Id.* "[T]he clarity of an order must be evaluated by a reasonableness standard, considering both the context in which it was entered and the audience to which it was addressed." *United States v. Cutler,* 58 F.3d 825, 835 (2d Cir.1995).

In this case, however, even assuming without deciding that the order of November 3, 2005, meets all constitutional requirements and is sufficiently clear, we hold that the contempt finding must be reversed because the Attorney General did not violate the court's order.

### 2

### No Violation of the November Order

 To establish civil contempt, there must be a showing by clear and convincing evidence that a specific order of the court has been violated. *Direct Action for Rights and Equality,* 819 A.2d at 661 (citing *Trahan,* 455 A.2d at 1311). "A finding of civil contempt must be based on a party's lack of substantial compliance with a court order, which is demonstrated by the failure of a party to 'employ[ ] the utmost diligence in discharging [its] * * * responsibilities.'" *Gardiner v. Gardiner,* 821 A.2d 229, 232 (R.I.2003) (quoting *Durfee,* 636 A.2d at 704). Determining whether there has been substantial compliance with an order of the court, so as to avoid a finding of civil contempt, "depend[s] on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest." *Durfee,* 636 A.2d at 704 (quoting *Fortin v. Commissioner of Massachusetts*

*Department of Public Welfare,* 692 F.2d 790, 795 (1st Cir.1982)).

Because the trial justice did not make any findings of fact with respect to why he found the Attorney General in contempt, it is difficult to evaluate whether his contempt finding was clearly wrong or an abuse of discretion. *See Durfee,* 636 A.2d at 704. Nevertheless, we are of the opinion that the Attorney General's "spin and twist" comment did not violate the November order because the record does not support the conclusion that the Attorney General knew or reasonably should have known that his remarks could create a substantial likelihood of material prejudice.

The Attorney General's comment was a brief statement, uttered in response to reporters' persistent and pointed questioning. Given the nature of the case—a highly contentious matter laden with public commentary from both sides and a high degree of public and media interest—we do not think the Attorney General knew or reasonably should have known that his remarks would prejudice defendants.

Furthermore, defendants have not alleged or shown that any jurors saw or were influenced by the comments. Rather, the jury specifically and repeatedly was ordered not to read any media coverage of the trial. Although we recognize that actual prejudice need not be shown, *see Gentile,* 501 U.S. at 1081, 111 S.Ct. 2720 (O'Connor, J., concurring), we are not persuaded that the comment would cause any prejudice, let alone material prejudice, to defendants.

Because we believe the Attorney General did not violate the November order, we reverse the trial justice's finding of contempt for the "spin and twist" comment and vacate the imposition of sanctions.

## C

### Contempt Finding Based on the Attorney General's "Duck and Run" Comment

 The trial justice also found the Attorney General in contempt after he determined that the Attorney General's "duck and run" comment violated the court's December order. We conclude that the December order was unenforceable because it was not sufficiently clear to be the basis of a contempt finding. Therefore, we reverse that finding of contempt as well and vacate the subsequent imposition of sanctions.[31]

As previously discussed, an order upon which a contempt finding is based must be sufficiently "specific, clear and precise" to put individuals on notice about what conduct is prohibited or required. *Ventures Management Co.*, 434 A.2d at 254 (quoting *Sunbeam Corp.*, 86 R.I. at 194, 134 A.2d at 162). The court's order on December 6, 2005, directed the Attorney General "to cease and desist from making any subjective characterizations of the defendants or any of them or of their agents, servants or attorneys." In our opinion, the term "subjective" was too vague and imprecise to allow for a subsequent finding of contempt.

Black's Law Dictionary defines "subjective" as "[b]ased on an individual's perceptions, feelings, or intentions, as opposed to externally verifiable phenomena." Black's Law Dictionary 1465 (8th ed. 2004). The phrase "subjective characterizations" did not adequately advise the Attorney General as to what speech was allowed and what speech was prohibited, given, it seems to us, that a vast number of statements could

be characterized as both objective and subjective. Given this vague wording, we do not believe that the Attorney General was put on adequate notice about what types of speech actually were prohibited. Thus, we reverse the trial justice's finding of contempt based on the "duck and run" comment and vacate the related sanctions.

## D

### Contempt Finding Based on the Attorney General's Official Website Posting

 It appears that in his written order of June 2, 2006, the trial justice also found the Attorney General in contempt of his February 22, 2006 bench order, which prohibited any "discussion" with jurors regarding the case. Because we do not believe the Attorney General's website posting qualified as a "discussion," we reverse the finding of contempt and vacate the imposition of sanctions.

 Because of the severe consequences of a civil-contempt finding, courts have "read court decrees to mean rather precisely what they say." *NBA Properties, Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir.1990). Any ambiguities or uncertainties in court orders are read in the light most favorable to the person charged with contempt. *Id.* at 32. Addressing this method of interpretation, Justice Frankfurter of the United States Supreme Court said in a colorful dissent:

"Obedience must of course be secured for the command of a court. To secure such obedience is the function of a proceeding for contempt. But courts

---

31. Again, we decline to base our decision on constitutional grounds given the previously discussed precedent. We note, however, that in an order issued on June 15, 2006, we indicated our grave reservations concerning the constitutionality of paragraph 1.1: "being

acutely mindful of our legal tradition of opting in favor of permitting the exercise of free speech rights except in truly unusual circumstances, we have concluded that the Order in question should be stayed pending final resolution by this Court."

should be explicit and precise in their commands and should only then be strict in exacting compliance. To be both strict and indefinite is a kind of judicial tyranny." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 195, 69 S.Ct. 497, 93 L.Ed. 599 (1949) (Frankfurter, J., dissenting).

We adopted this standard in *Sunbeam Corp.*, 86 R.I. at 195, 134 A.2d at 163, in which the respondent was enjoined from selling certain products "in its place of business." Reading this prohibition narrowly, we accepted the respondent's literal interpretation that a sale on the sidewalk outside its place of business did not violate the order. *Id.* at 195–96, 134 A.2d at 163. We said that "[t]his may be a narrow construction of the injunction in [respondent's] favor, but under the law as we understand it the respondent is entitled to rely on such a construction." *Id.* at 196, 134 A.2d at 163.

Similarly, in *United States v. Charmer Industries, Inc.*, 722 F.2d 1073, 1076 (2d Cir.1983), the Arizona Attorney General was enjoined "from making any publication or other use of any portion of the [defendant's Presentence] Report." When the Attorney General's office gave a newspaper reporter a memorandum with references to that report, a contempt motion was filed. *Id.* The trial justice, however, refused to find the attorney involved in contempt because the actual report was not provided to reporters. *Id.* at 1077. The Second Circuit affirmed this holding: "Although we consider [the attorney's] conduct reprehensible, we feel compelled to accept [the trial justice's] findings as not clearly erroneous and to deny the contempt motion principally because there was not a clear directive from this Court which barred the actions undertaken by [the attorney]." *Id.*

Here, the parties were enjoined from having "any discussion with this jury." Interpreting this language narrowly, as we must, we cannot conclude that a website posting qualifies as a "discussion," which typically involves an exchange of information or ideas between more than one person. Constrained by the actual words in the bench order, we reverse the trial justice's finding of contempt and vacate the imposition of sanctions.

Finally, and although we reverse each finding of contempt, we would be remiss if we did not acknowledge the enormous burden that the trial justice carried as he presided over litigation that must have seemed interminable and that always was accompanied by a significant amount of local and national media glare, public posturing, and a high level of general interest. Our reversal should in no way be interpreted as a criticism of the prodigious effort of the trial justice to control this litigation and keep all parties and counsel focused on the legal issues. Despite our vacating of the contempt orders, we continue to have enormous respect for this conscientious and scholarly trial justice.

### Conclusion

For the foregoing reasons, we reverse the contempt findings of the Superior Court.

### Track V

### The Contingent Fee Issue

### Justice ROBINSON, for the Court.

Although this Court has today held that the legal construct known as public nuisance does not constitute an appropriate cause of action in a case involving facts such as those presented by this case, thus technically rendering moot the issue of whether or not the execution of a contingent fee agreement between the Attorney General and certain private law firms was

appropriate, we have nevertheless decided to address the legal issues surrounding the permissibility *vel non* of such an arrangement.[32]

# I

## Facts and Travel

The public health issues surrounding the use of lead paint in Rhode Island prompted the immediately previous Attorney General to commence a civil action against defendants in the Superior Court on October 12, 1999. *See State v. Lead Industries Association, Inc.*, 898 A.2d 1234, 1235 (R.I. 2006). Prior to commencing that civil action, cognizant of the fact that there were not adequate resources to finance such a demanding and substantial civil case, that same Attorney General had executed a contingent fee agreement with the law firms of Ness, Motley, Loadholt, Richardson & Poole (now known as Motley Rice LLP) and Decof & Grimm (now known as Decof & Decof).[33] *Id.* That agreement provided that, in return for their legal representation on behalf of the state in the lead paint litigation, Contingent Fee Counsel would be entitled to a fee reflecting 16 ⅔ percent of any monies recovered.[34] *Id.*

During the course of this litigation, defendants sought a ruling by the Superior Court that the contingent fee agreement was unenforceable and void because, in defendants' view, said agreement (1) constituted an unlawful delegation of the Attorney General's authority and (2) was vio-

lative of public policy.[35] *Lead Industries Association, Inc.*, 898 A.2d at 1235–36. Following a series of events that are set forth in greater detail in our earlier opinion with respect to this issue, the Superior Court declined to make such a ruling and upheld the contingent fee agreement as a lawful contract. *Id.*

Thereafter, defendants petitioned this Court for a writ of certiorari to review the narrow question of whether or not the contingent fee agreement between the Attorney General and Contingent Fee Counsel was lawful. *Lead Industries Association, Inc.*, 898 A.2d at 1237. After hearing oral argument with respect to that issue on April 3, 2006, this Court ultimately declined to address the issue at that time because, upon reflection, we determined that it was not then properly justiciable. *Id.* at 1237–40.

On May 15, 2008, when oral argument was held with respect to the merits (and associated issues), we also entertained further oral argument with respect to the contingent fee issue. The oral arguments of counsel in both April of 2006 and May of 2008, as well as the briefs of the parties and of amici, have been helpful to us in grappling with what is an issue of first impression for this Court.

# II

## Capable of Repetition, Yet Evading Review

On many occasions we have stated that we are reluctant to opine on an

---

**32.** Our reasons for reaching the contingent fee issue in spite of the presence of mootness are set forth in section "II" of this opinion, *infra.*

**33.** We shall refer to the two law firms collectively as "Contingent Fee Counsel."

**34.** Pertinent portions of the contingent fee agreement between the Attorney General and Contingent Fee Counsel are set forth exten-

sively in this Court's earlier opinion concerning the contingent fee issue. *State v. Lead Industries Association, Inc.*, 898 A.2d 1234, 1235–36 n. 4 (R.I.2006).

**35.** The defendants' public policy argument was largely predicated on the reasoning of the Supreme Court of California in *People ex rel. Clancy v. Superior Court*, 39 Cal.3d 740, 218 Cal.Rptr. 24, 705 P.2d 347 (1985).

issue that has become moot; as a general rule, courts should restrict themselves to the resolution of live controversies. *See, e.g., Pelland v. State,* 919 A.2d 373, 378 (R.I.2007); *Sullivan v. Chafee,* 703 A.2d 748, 752 (R.I.1997). Like so many other rules, however, this prudential rule is accompanied by an exception; pursuant to that exception, we will on occasion opine on moot questions that are "of extreme public importance [and] are capable of repetition but * * * evade review." *Morris v. D'Amario,* 416 A.2d 137, 139 (R.I.1980); *see also Unistrut Corp. v. Department of Labor and Training,* 922 A.2d 93, 99 (R.I. 2007); *Krivitsky v. Town of Westerly,* 823 A.2d 1144, 1146–47 (R.I.2003).

In our view, the instant contingent fee issue falls into the latter category; we have concluded that this particular subject is one of extreme public importance and is also one that is "capable of repetition, yet evades review." *State v. Cosores,* 891 A.2d 893, 894 (R.I.2006) (mem.); *see also State v. Perry,* 944 A.2d 177, 178 (R.I.2008) (mem.) ("This Court will review moot cases when the subject matter is of 'extreme public importance' and the issues are capable of repetition but evade review.") (quoting *Pelland,* 919 A.2d at 378); *Arnold v. Lebel,* 941 A.2d 813, 818–19 (R.I. 2007); *see generally Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911) (employing for the first time, at least at the United States Supreme Court level, the "capable of repetition, yet evading review" formulation).

Although we generally refrain from addressing issues that the case at hand does not require us to address, there are occasions when we deem it jurispru-

dentially sound to provide guidance with respect to an issue that "is bound to resurface" at some future point in time. *Splendorio v. Bilray Demolition Co.,* 682 A.2d 461, 464 (R.I.1996); *see Mello v. Superior Court,* 117 R.I. 578, 581, 370 A.2d 1262, 1263 (1977) ("[I]n certain situations we will depart from the ordinary to better deal with the extraordinary."); *see also State v. Delaurier,* 488 A.2d 688, 691 n. 1 (R.I. 1985). This is just such an occasion. In our judgment, it would be a disservice to our fellow judicial officers and to the Attorney General and to the public at large if we were to decline to address the contingent fee issue that has been the subject of so much discussion both locally and in other jurisdictions. *See* note 50, *infra.*

## III

### The Responsibilities and Duties of the Attorney General

#### A

#### The Office of Attorney General

We begin our analysis by directing attention to the special nature of the constitutional office of Attorney General in this state. *See* R.I. Const. art. 9, sec. 12.[36] In *Suitor v. Nugent,* 98 R.I. 56, 58, 199 A.2d 722, 723 (1964), we quoted with approval the following historical observation by the Supreme Court of Pennsylvania in the case of *Commonwealth ex rel. Minerd v. Margiotti,* 325 Pa. 17, 188 A. 524 (1936):

"The office of Attorney General is an ancient one. It came into being as a necessary adjunct in the administration of the common law of England and was transported to America in the early days of the establishment of government in

---

**36.** Article 9, section 12, of the Rhode Island Constitution reads in its entirety as follows: "The duties and powers of the secretary, attorney-general and general treasurer shall be the same under this Constitution as are now established, or as from time to time may be prescribed by law."

the colonies as part of their English derived common law." *Id.* at 526.[37]

In Rhode Island, the attorney general is vested with all the powers that that office possessed at common law. *See Suitor,* 98 R.I. at 58–59, 199 A.2d at 723; *see also* 7 Am.Jur.2d *Attorney General* § 6 (2007). Indeed, the Rhode Island constitution recognizes the Office of the Attorney General and provides for its continued existence with all the powers inherent at common law; it also provides that the General Assembly may imbue the Attorney General with powers in addition to those common law powers. *See Suitor,* 98 R.I. at 58, 199 A.2d at 723 ("The constitution did not purport to create such an office but recognized it as existing and provided for continuance of the powers and duties exercised by its occupant prior to the adoption of the constitution."); *see also* R.I. Const. art. 9, sec. 12.

## B

### The Attorney General's Role Distinguished from the Role of the Usual Advocate

Although all attorneys have numerous important duties and responsibilities by virtue of their role as members of the bar, attorneys general have additional special duties which, because of the nature of that ancient and powerful governmental office, differ from those of the usual advocate.[38] Unlike other attorneys who are engaged in the practice of law, the Attorney General "has a common law duty to represent the public interest." *Newport Realty, Inc. v. Lynch,* 878 A.2d 1021, 1032 (R.I.2005) (internal quotation marks omitted). As we have previously stated, "[t]he Attorney General of the State of Rhode Island holds a constitutional office with specific and significant responsibilities to the people of Rhode Island." *Mottola v. Cirello,* 789 A.2d 421, 424 (R.I.2002); *see also State v. Briggs,* 886 A.2d 735, 756 n. 9 (R.I.2005); *State v. Peters,* 82 R.I. 292, 297, 107 A.2d 428, 431 (1954) ("[The Attorney General] is in effect the representative of the people and not an advocate in the ordinary meaning of that term. * * * He represents all the people of the [state], including the defendant * * *.") (internal citations and quotation marks omitted).

In view of the grave responsibilities of attorneys general vis-à-vis the public, the holder of that high office, as distinguished from the usual advocate,[39] has a special and enduring duty to "seek jus-

---

**37.** The office of Attorney General is of ancient vintage. It was known to Shakespeare (*see* Richard II, act 2, sc. 1), and it appears to have existed long before that era. *See* Hugh H.L. Bellot, *The Origin of the Attorney–General,* 25 L.Q. Rev. 400, 404 (1909).

**38.** In this opinion's discussion concerning the special duties of attorneys general, we shall frequently employ the term "the usual advocate" to refer to the broad class of all attorney advocates as distinguished from the much narrower class of those lawyers who are attorneys general or employees of same. The term "the usual advocate" is used in this manner in the American Bar Association Model Code of Professional Responsibility. *See* note 40, *infra.* Our use of said term implies absolutely no disrespect.

**39.** We wish to indicate in the strongest terms that we should not be understood as implying that lawyers in general should be indifferent to the need for justice in our society. Indeed, members of the legal profession should be especially sensitive to that noble concept and should be proactive in efforts to bring about an ever more just society. *See generally* Preamble to the Supreme Court Rules of Professional Conduct.

At the same time, however, given the nature of the adversary system, it is requisite that, when engaged in litigation, "the usual advocate" (as contrasted with the Attorney General) must single-mindedly represent the client to the best of his or her ability, and opposing counsel must do likewise for the other party. The adversary system is based upon the assumption that truth and justice will be the

tice." *See, e.g.,* Bruce A. Green, *Why Should Prosecutors "Seek Justice"?,* 26 Fordham Urban L.J. 607, 612 (1999) ("The literature of the legal profession refers to the prosecutor's duty to 'seek justice' or 'do justice,' a professional ideal that analogizes prosecutors to judges and distinguishes prosecutors from other lawyers.").[40] In other words, the Attorney General "has the responsibility of a minister of justice and not simply that of an advocate." Commentary to Article V, Rule 3.8 of the Supreme Court Rules of Professional Conduct; *see also Newport Realty, Inc.,* 878 A.2d at 1032; *State v. Ciulla,* 115 R.I. 558, 568, 351 A.2d 580, 586 (1976); *Orabona v. Linscott,* 49 R.I. 443, 445, 144 A. 52, 53 (1928). We are acutely aware of and are in full accord with the principle that the United States Supreme Court so cogently expressed with respect to the prosecutorial role in the frequently quoted case of *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, * * * is not that it shall win a case, but *that justice shall be done.* As such, he is in a peculiar and very definite sense the servant of the law * * *. He may prosecute with earnestness and vigor— indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* at 88, 55 S.Ct. 629 (emphasis added).[41]

While the just-quoted passage from the Supreme Court's unanimous opinion in the *Berger* case related to a federal criminal

end product of this dialectical process. *See, e.g., Gannett Co. v. DePasquale,* 443 U.S. 368, 384, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) ("[O]ur adversary system * * * is premised upon the proposition that the public interest is fully protected by the participants in the litigation."). Although there undoubtedly are occasions when the adversary system does not yield such an end product, it is nonetheless the system that Anglo–American jurisprudence has for centuries deemed to be the best for arriving at truth and justice.

**40.** *See also* American Bar Association Model Code of Professional Responsibility EC 7–14 ("A government lawyer in a civil action or administrative proceeding has the responsibility to *seek justice * * *.*") (emphasis added) (hereinafter ABA Model Code); ABA Model Code EC 7–13 ("The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to *seek justice,* not merely to convict."). (Emphasis added.)

 The ABA Model Code further elaborates on the duty of attorneys general to seek justice in the following words:

"This special duty exists because: (1) the prosecutor represents the sovereign and

therefore should use restraint in the discretionary exercise of governmental powers; * * * [and] (2) during trial the prosecutor is not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all * * *." EC 7–13.

**41.** *See also Brady v. Maryland,* 373 U.S. 83, 87 n. 2, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("[T]he Government wins its point when justice is done in its courts.") (quoting Solicitor General Frederick W. Lehmann as attributed to him by Solicitor General (later Judge) Simon E. Sobeloff in an address before the Judicial Conference of the Fourth Circuit (June 29, 1954)); *United States v. Bartelho,* 129 F.3d 663, 671 (1st Cir.1997) (also quoting Solicitor General Sobeloff's address); *Trout v. Garrett,* 780 F.Supp. 1396, 1421 n. 60 (D.D.C. 1991) (noting that the following variant of Solicitor General Lehmann's statement is carved as an inscription above the entrance to the Office of the Attorney General of the United States: "The United States wins its point whenever justice is done its citizens in the courts.").

prosecution, it is our conviction that the same philosophy should guide each and every undertaking of the Attorney General of this state. It is the duty of the Attorney General to see to it "that justice shall be done" not only in the context of criminal prosecutions, but also while he or she carries out all the functions of that high office-including engagement in litigation in the civil arena. *Id.; see generally Freeport–McMoRan Oil & Gas Co. v. Federal Energy Regulatory Commission,* 962 F.2d 45, 47 (D.C.Cir.1992) (Mikva, C.J.) (stating that the solemn duty to do justice applies "with equal force to the government's civil lawyers").[42]

The principle that it is a government lawyer's duty to seek justice is as widely recognized as it is venerable.[43] *See, e.g., Brady v. Maryland,* 373 U.S. 83, 88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Freeport–McMoRan Oil & Gas Co.,* 962 F.2d at 47; *Hurd v. People,* 25 Mich. 404, 416 (1872) ("The prosecuting officer represents the public interest * * *. His object like that of the court, should be simply justice; and he has no right to sacrifice this to any pride of professional success."); *Foute v.*

*State,* 4 Tenn. (3 Hayw.) 98, 99 (1816) ("[The prosecutor] is * * * to * * * combine the public welfare and the [safety] of the citizens, preserving both, and not impairing either; he is to decline the use of individual passions, and individual malevolence, when he can not use them for the advantage of the public; he is to lay hold of them where public justice * * * requires it."). It is a principle that must at all times be carefully adhered to by every person who serves in that capacity, and the courts must be ever vigilant in this regard.

■ Pursuant to article 9, section 12, of the present Rhode Island Constitution, the duties and powers of the Attorney General remain the same under the Constitution as they had existed at the time the Constitution was adopted "or as from time to time may be prescribed by law." Accordingly, the Attorney General in Rhode Island has broad powers and responsibilities pursuant to the Rhode Island Constitution, several Rhode Island statutes,[44] and the common law.[45] In the course of exercising those powers, the Attorney General is vested with broad discre-

**42.** The ABA Model Code expressly states that a "government lawyer in a civil action or administrative proceeding has the responsibility to seek justice" and "should refrain from instituting or continuing litigation that is obviously unfair." EC 7–14; *see also City of Los Angeles v. Decker,* 18 Cal.3d 860, 135 Cal. Rptr. 647, 558 P.2d 545, 551 (1977) ("Occupying a position analogous to a public prosecutor, [a government lawyer in the civil arena] is possessed of important governmental powers that are pledged to the accomplishment of one objective only, that of impartial justice.") (internal quotation marks omitted).

**43.** For a more complete exposition of the origins of the concept that it is the duty of attorneys general to seek justice, see Bruce A. Green, *Why Should Prosecutors "Seek Justice"?,* 26 Fordham Urban L.J. 607 (1999).

**44.** *See, e.g.,* G.L. 1956 chapter 9 of title 42 (establishing the department of the attorney general and setting forth its powers and

duties); G.L. 1956 § 12–1–4 (creating a division of criminal identification in the department of the attorney general); § 12–1–7 (providing that the attorney general shall procure and file certain criminal identification records); § 12–1–8.1 (concerning a method of identification).

**45.** *See Suitor v. Nugent,* 98 R.I. 56, 58, 199 A.2d 722, 723 (1964) ("The constitution did not purport to create such an office but recognized it as existing and provided for continuance of the powers and duties exercised by its occupant prior to the adoption of the constitution."); *see also Orabona v. Linscott,* 49 R.I. 443, 445, 144 A. 52, 53 (1928) ("Under the Constitution and by long-established practice great power and responsibility for the enforcement of the criminal laws are lodged in the Attorney General.").

Those attorneys general who are vested with authority pursuant to the common law

tion.[46] In view of the Attorney General's position as a constitutional officer and in view of his or her considerable discretionary powers, this Court has historically tended, whenever appropriate, to give deference to the strategic and tactical decisions made by those who hold that high office. *See, e.g., Mottola,* 789 A.2d at 425 ("It is not the province of this Court, or the Superior Court, to dictate how the Attorney General elects to carry out the * * * functions of his office.").

It is our view that the Attorney General is entitled to act with a significant degree of autonomy, particularly since the Attorney General is a constitutional officer and is an independent official elected by the people of Rhode Island. We are impressed by the following language that appears in the opinion of the United States Court of Appeals for the Fifth Circuit in the case of *State ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266 (5th Cir.1976):

"The Attorney General is elected by the people; he is entrusted by them with the common law power to legally represent them or some of them in matters deemed by him to affect the public interest. * * * *Regardless of the effectiveness of his efforts in particular public legal situations, at least the people have the continuing satisfaction of knowing that their elected Attorney General has the right to exercise his conscientious official discretion to enter into those legal matters deemed by him to involve the public interest, even though not expressly authorized by statute." Id.* at 268 n. 6 (internal quotation marks omitted).[47]

Bearing in mind the foregoing considerations relative to the Attorney General's powers and responsibilities, we now turn to the concrete issue before us—*viz.,* whether or not it is appropriate for the holder of that office to enter into a contingent fee agreement in a civil case such as this one.

## IV

## The Propriety of Contingent Fee Arrangements

Although we are keenly aware of the gravity of the issue and of the fact

(as is the case in Rhode Island) possess a wide variety of powers. *See* 7 Am.Jur.2d *Attorney General* § 6 at 11 (2007) ("Under the common law, the attorney general has the power to bring any action which he or she thinks necessary to protect the public interest, a broad grant of authority which includes the power to act to enforce the state's statutes. In the exercise of these common-law powers, an attorney general may not only control and manage all litigation on behalf of the state, but may also intervene in all suits or proceedings which are of concern to the general public."); *see also State of Florida ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266, 268–69 (5th Cir.1976) ("[The duties and powers of attorneys general] are not exhaustively defined by either constitution or statute but include all those exercised at common law. * * * [Accordingly, the attorney general] typically may exercise all such authority as the public interest requires. And the attorney

general has wide discretion in making the determination as to the public interest.").

46. *See, e.g., In re House of Representatives (Special Prosecutor),* 575 A.2d 176, 179 (R.I. 1990) ("A key aspect of the Attorney General's role as public prosecutor is the element of discretion. It is well settled in this state that the Attorney General is the only state official vested with prosecutorial discretion.") (internal quotation marks omitted); *Suitor,* 98 R.I. at 60, 199 A.2d at 724 ("[T]his court recognizes that the attorney general, in acting to enforce the * * * law, performs acts which require an exercise of judgment or discretion * * *."); *see also State v. Rollins,* 116 R.I. 528, 533, 359 A.2d 315, 318 (1976).

47. Although the Fifth Circuit in the cited case was discussing the role of the Attorney General in another state, we consider its descriptive words to be equally applicable to the Attorney General of Rhode Island.

that thoughtful and potent policy-based arguments have been made on both sides of the issue, in the end we have concluded that, in principle, there is nothing unconstitutional or illegal or inappropriate in a contractual relationship whereby the Attorney General hires outside attorneys on a contingent fee basis to assist in the litigation of certain *non-criminal*[48] matters. Indeed, it is our view that the ability of the Attorney General to enter into such contractual relationships may well, in some circumstances, lead to results that will be beneficial to society—results which otherwise might not have been attainable.[49]

However, due to the special duty of attorneys general to "seek justice" and their wide discretion with respect to same, such contractual relationships must be accompanied by exacting limitations. In short, it is our view that the Attorney General is not precluded from engaging private counsel pursuant to a contingent fee agreement in order to assist in certain civil litigation, so long as the Office of Attorney General retains *absolute and total control over all critical decision-making* in any case in which such agreements have been entered into.[50] *See, e.g., County of Santa Clara v.*

**48.** We emphasize that this opinion's exposition of our present view concerning contingent fee agreements should be understood as being strictly limited to the context of civil litigation. We explicitly refrain from extending such views to the criminal context. Indeed, we are unable to envision a criminal case where contingent fees would ever be appropriate-even if they were not explicitly barred, as is the case in this jurisdiction. *See* Article V, Rule 1.5(d)(2) of the Supreme Court Rules of Professional Conduct ("A lawyer shall not enter into an arrangement for, charge, or collect * * * a contingent fee for representing a defendant in a criminal case."); *see also* ABA Model Code DR 2-106(C) (same); Peter Lushing, *The Fall and Rise of the Criminal Contingent Fee*, 82 J. Crim. L. & Criminology 498, 500 (1991) ("Contingent fees for criminal defense attorneys * * * are almost uniformly considered unethical and illegal."); F.B. MacKinnon, *Contingent Fees for Legal Services: A Study of Professional Economics and Responsibilities* 52 (1964) ("The third area of practice [in addition to domestic relations and government lobbying] in which the use of the contingent fee is generally considered to be prohibited is the prosecution and defense of criminal cases.").

We are cognizant of the fact that the legal construct known as public nuisance has some historical relationship with the criminal law and may, even today, sometimes be the basis for a criminal prosecution. *See, e.g., People ex rel. Clancy*, 218 Cal.Rptr. 24, 705 P.2d at 353. Significantly, however, the case presently before us is completely civil in nature.

**49.** *See* Peter Karsten, *Enabling the Poor to Have Their Day in Court: The Sanctioning of Contingency Fee Contracts, A History to 1940*, 47 DePaul L. Rev. 231 (1998) (discussing, in a particularly scholarly manner, the early history of contingent fee agreements).

**50.** We pause to note that the propriety *vel non* of contingent fee agreements in the public sector is a much controverted and still developing area of the law. *See, e.g., People ex rel. Clancy*, 218 Cal.Rptr. 24, 705 P.2d at 351–52 (holding that the contingent fee arrangement between the city government and outside counsel was improper); *County of Santa Clara v. Superior Court*, 161 Cal.App.4th 1140, 74 Cal.Rptr.3d 842, 853 (2008) (stating that the just-cited decision of the Supreme Court of California in *Clancy* "does not bar the public entities from engaging private counsel under a contingent fee arrangement to assist in [public nuisance] litigation, so long as the public entities' in-house counsel retain control over all decision-making"); *State v. Hagerty*, 580 N.W.2d 139, 147–48 (N.D.1998) (holding that the attorney general of that state possessed the authority to employ special assistant attorneys general on a contingent fee basis); Exec. Order No. 13433, 72 Fed. Reg. 28441 (May 16, 2007) (barring federal agencies from employing lawyers on a contingent fee basis in all instances); Mark A. Behrens & Andrew W. Crouse, *The Evolving Civil Justice Reform Movement: Procedural Reforms Have Gained Steam, But Critics Still Focus on Arguments of the Past*, 31 U. Dayton L. Rev. 173, 182–83 (2006) (noting that, as of that time, seven states (Colorado, Connecticut, Kansas,

*Superior Court,* 161 Cal.App.4th 1140, 74 Cal.Rptr.3d 842, 850 (2008). In our view, it is imperative that the case-management authority of the Attorney General, where a contingent fee agreement is involved, be "final, sole and unreviewable." *Philip Morris Inc. v. Glendening,* 349 Md. 660, 709 A.2d 1230, 1243 (1998).[51]

As we have sought to explain in some detail earlier in this opinion, attorneys general are charged with the special duty to seek justice—a duty which is quite different from the responsibilities of the usual advocate. In accordance with that principle, we wholeheartedly agree with Chief Judge Mikva of the United States Court of Appeals for the District of Columbia when he wrote in almost perfervid language:

> "Government lawyers * * * should also refrain from continuing litigation that is obviously pointless, that could easily be resolved, and that wastes Court time and taxpayer money. * * * [A] government lawyer has obligations that might sometimes trump the desire to pound an opponent into submission." *Freeport–McMoRan Oil & Gas Co.,* 962 F.2d at 47, 48.

The usual advocate, on the other hand, is not held to quite such an abnegatory and demanding standard. Accordingly, in order to ensure that a contingent fee agreement is not adverse to the standards that an attorney representing the government must meet, it is vital that the Office of the Attorney General have absolute control over the course of any litigation originating in that office.

■■■ At the risk of being repetitive, we would emphasize that the Attorney General's discretionary decision-making must not be delegated to the control of outside counsel; rather, it is the outside counsel who must serve in a subordinate role. *See United States v. Cox,* 342 F.2d 167, 192 (5th Cir.1965) ("[The Attorney General] is the representative of the public in whom is lodged a discretion which is not to be controlled by * * * an interested individual, or by a group of interested individuals * * *."); *People v. Superior Court of Contra Costa County,* 19 Cal.3d 255, 137 Cal. Rptr. 476, 561 P.2d 1164, 1172 (1977) ("[The] advantage of public prosecution is lost if those exercising the discretionary duties of the [Attorney General] are subject to conflicting personal interests which might tend to compromise their impartiality."); *see also County of Santa Clara,* 74 Cal.Rptr.3d at 850 (holding that the duty

---

Minnesota, North Dakota, Texas, and Virginia) had adopted legislation that regulates the manner in which their respective attorneys general may enter into contingent fee agreements); Valerie Jablow, *Governments and Tort 'Reformers' Clash Over the Hiring of Private Lawyers,* 43 Trial 12 (Aug. 2007).

We have concluded that the reasoning of the Supreme Court of California in *Clancy* is distinguishable from the case at bar for the reasons set forth in *City and County of San Francisco v. Philip Morris, Inc.,* 957 F.Supp. 1130, 1135 (N.D.Cal.1997) and in *County of Santa Clara,* 74 Cal.Rptr.3d at 848–53.

Given the continuing dialogue about the propriety of contingent fee agreements in the governmental context, we expressly indicate that our views concerning this issue could possibly change at some future point in time.

**51.** There is wisdom in the ancient maxim: *"De minimis non curat lex."* (The law does not concern itself with trifles.) In that vein, we recognize that, in the course of litigation in which contingent fee counsel is involved, certain decisions of the "de minimis" or ministerial variety will from time to time have to be made. As to who should make such relatively petty decisions, pragmatism rather than rigidity should be the watchword. *See Peak v. United States,* 353 U.S. 43, 46, 77 S.Ct. 613, 1 L.Ed.2d 631 (1957) ("[C]ommon sense often makes good law."). Nevertheless, when there is doubt as to who should make a particular decision, the "close calls" should be made in favor of the decisional authority of the Attorney General.

of government attorneys to seek justice is not contravened when private counsel, retained on a contingent fee basis, "are merely assisting * * * in the litigation* * * and are explicitly serving in a *subordinate* role * * *.").

▮▮▮ In order to ensure that meaningful decision-making power remains in the hands of the Attorney General, it is our view that, at a bare minimum, the following limitations should be expressly set forth in any contingent fee agreement between that office and private counsel: (1) that the Office of the Attorney General will retain complete control over the course and conduct of the case; (2) that, in a similar vein, the Office of the Attorney General retains a veto power over any decisions made by outside counsel; and (3) that a senior member of the Attorney General's staff must be personally involved in all stages of the litigation.[52]

Moreover, not only must the Attorney General have absolute control over all stages of the litigation, but he or she must also *appear* to the citizenry of Rhode Island and to the world at large to be exercising such control. *See Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954) ("[J]ustice must satisfy the appearance of justice."); *see also Young v.*

*United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 806, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987); *Marshall v. Jerrico,* 446 U.S. 238, 242, 243, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980); *Superior Court of Contra Costa County,* 137 Cal.Rptr. 476, 561 P.2d at 1172 ("[I]t is precisely because the prosecutor enjoys such broad discretion that the public he serves and those he accuses may justifiably demand that he perform his functions with the highest degree of integrity and impartiality, and *with the appearance thereof.*")(emphasis added).

## V

### The Appropriation Issue

#### A

#### The Defendants' Contention

We now turn to address defendants' contention that contingent fee agreements between the Attorney General and private counsel are violative of Rhode Island law because (in defendants' view) such agreements are tantamount to an unlawful appropriation of state funds. The defendants contend that, when the Office of the Attorney General finds itself in receipt of money that rightly is the state's, it must pay *all* of that money into the General Treasury.[53] The defendants maintain that

---

**52.** We would caution that the above-enumerated limitations are not exhaustive; the presence of such limitations in a particular contingent fee arrangement is not a guarantee that that agreement will pass muster. The issue of the Attorney General's entering into contingent fee agreements is at this point in time very much *terra incognita,* and careful review on a case-by-case basis will be required.

**53.** In support of their argument, defendants have pointed to G.L.1956 § 35–6–7, which provides in pertinent part as follows:
"Every clerk, officer, or other person who * * * shall neglect or refuse to pay into the state treasury any money belonging to the state, at the time when the money ought to

be paid, shall forfeit thrice the amount of the money so withheld or not paid, to be recovered in an action of debt, in the name of the general treasurer, for the use of the state."
The defendants have also directed this Court's attention to G.L.1956 § 35–4–2 and § 35–4–4.
The relevant portion of § 35–4–2 provides:
"All revenue of the state of whatever character shall be paid into the hands of the general treasurer and credited to the general funds of the state * * *."
Section 35–4–4 provides:
"All moneys due to the state shall be paid to the general treasurer, who shall be respon-

contingent fee agreements would permit the Attorney General to circumvent the statutory requirement of payment to the General Treasury because such agreements would provide that a percentage of any damages would have to be paid to outside counsel before the balance would be passed on to the General Treasury. As defendants phrase their argument, officers of the state, including the Attorney General, "are not permitted to decide for themselves to divert the State's receipts * * *."

## B

## The Equitable Lien

We have given due consideration to defendants' argument that payment of a contingent fee would represent an illegal diversion of the state's receipts, but we have concluded that defendants' position is overly myopic.

In our judgment, a successful contingent fee attorney has an *equitable lien* on any recovered damages in accordance with the term of the fee agreement.[54] *See Button's Estate v. Anderson*, 112 Vt. 531, 28 A.2d 404, 406 (1942) ("Where the parties have contracted that the attorney shall receive a specified amount of the recov-

ered fund, such agreement will create an *equitable lien* on the fund in favor of the attorney * * *.") (emphasis added);[55] *see also Barnes v. Alexander*, 232 U.S. 117, 120, 34 S.Ct. 276, 58 L.Ed. 530 (1914) (Holmes, J.); *Wylie v. Coxe*, 56 U.S. (15 How.) 415, 419–20, 14 L.Ed. 753 (1853); 7 Am.Jur.2d *Attorneys at Law* § 319 at 354 (2007) ("Where the parties contract that the attorney will receive his or her fee from the amount recovered, the agreement creates an equitable lien in favor of the attorney * * *."). After the appropriate fee has been paid to contingent fee counsel, the net amount would constitute what defendants characterize as "the State's receipts"—and that amount would indeed be payable to the General Treasury.[56]

The amount properly to be paid to contingent fee counsel pursuant to a contingent fee agreement falls within the realm of equity; as such, it is inherently within a court's discretion to oversee the payment of such amounts to contingent fee counsel. Although the state would hold the legal title to any damages that might be awarded to the state in a civil trial, outside counsel who are retained on a contingent fee basis would have an equitable right to the portion of such damages that repre-

sible for the safekeeping and proper disbursement thereof according to law."

**54.** As we emphasize below, there is nothing automatic about such an equitable lien. Judicial oversight concerning attorneys' fees continues to be a matter of importance, as it historically has been.

**55.** Although it is of no real relevance to the legal principles that the Vermont opinion so well articulates, it is fascinating to note the historical context of *Button's Estate v. Anderson*, 112 Vt. 531, 28 A.2d 404 (1942). It appears that, **in 1932,** the Governor of Vermont retained two nongovernmental attorneys "to take charge of, prosecute and endeavor to collect and recover from the government of the United States the claim of the

State of Vermont for expenditures for military purposes **in the war of 1812–1815** with Great Britain." *Id.* at 405 (emphasis added). One cannot help but recall the famous remark by one of William Faulkner's characters: "The past is never dead. It's not even past."

**56.** The fact that, in Rhode Island, the Attorney General is a constitutional officer militates against any suggestion that, in a contingent fee situation, the *gross* amount of damages recovered must be deposited in the General Treasury with the proper contingent fee to be paid only thereafter upon a vote of appropriation in the General Assembly. Such a regime would accord insufficient respect to the Attorney General's status as a constitutional officer.

sents their fee (subject to the significant caveat referenced in the next subsection of this opinion). *See State v. Hagerty*, 580 N.W.2d 139, 144–45 (N.D.1998); *Button's Estate*, 28 A.2d at 406–07, 409–10; *City of Montpelier v. Gates*, 106 Vt. 116, 170 A. 473, 475–76 (1934). We unreservedly agree with the Supreme Court of Vermont when it made the following helpful distinction between legal title and equitable rights in the context with which we are presently confronted:

> "Although the *legal title* to the whole fund no doubt is in the State, the [contingent fee attorneys] have *equitable rights* to that portion of the same which represents their fee. This part in all equity and good conscience belongs to them. They have earned it and should receive it. This portion of the fund never legally and equitably belonged to the State as part of its public funds for, at the latest, when received, the lien attached to it and remains upon it so that it is held by the State subject to the same." *Button's Estate*, 28 A.2d at 410 (emphasis added).

As that same court stated in an earlier case: "It is all a matter of bookkeeping, and an honest creditor is not to be denied, simply because the payment of his claim may somewhat upset the treasurer's books." *City of Montpelier*, 170 A. at 475; *see also Button's Estate*, 28 A.2d at 410.

### C

### Judicial Oversight

 It is our view that, in cases such as the one at bar, the contingent fee payable to outside counsel should be subject to oversight and scrutiny by the courts

*before* payment is made to said counsel and *before* any net amount would be payable to the state. Courts have the inherent authority to review attorney contingent fee contracts in order to prevent unreasonableness.[57] *See, e.g., In re Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*, 778 F.2d 890, 896 (1st Cir. 1985) ("Contingent fees are, of course, of special concern to courts and are subject to strict judicial supervision."); *see also United States ex rel. Taxpayers Against Fraud v. General Electric Co.*, 41 F.3d 1032, 1047 (6th Cir.1994) ("[A]n attorney's right to contract for a contingent fee is not completely beyond judicial control. A lawyer is first an officer of the court, and as such his commercial contractual rights must yield to his duty. [A] judge has broad equity power to supervise the collection of attorney's fees under contingency fee contracts.") (internal quotation marks omitted); *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 226, 240 (2d Cir.1987) (holding that, pursuant to a well established principle, courts may review contingent fee agreements); *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1277 (8th Cir. 1980) ("The court has the power and the responsibility to monitor contingency fee agreements for reasonableness."); *Farmington Dowel Products Co. v. Forster Mfg. Co.*, 421 F.2d 61, 90–91 (1st Cir.1969); 7 Am.Jur.2d *Attorneys at Law* § 239 at 288 (2007) ("Courts possess traditional authority to supervise the charging of fees for legal services pursuant to their inherent and statutory power to regulate the practice of law."). Moreover, a court may examine an attorney's fee for reasonableness even when the parties themselves have not

---

**57.** Pursuant to Rule 1.5 of the Rules of Professional Conduct, an attorney's fee must be reasonable; any fee, including a contingent fee, is subject to oversight by the courts to ensure that a particular fee or fee agreement is, in fact, reasonable. That Rule sets forth a non-exclusive list of factors that a court must consider when determining whether or not an attorney's fee is reasonable.

challenged the validity of the fee arrangement. *See Rosquist v. Soo Line Railroad,* 692 F.2d 1107, 1111 (7th Cir.1982); *see also* 7 Am.Jur.2d § 239 at 288 ("A court may inquire into the reasonableness of attorney fees as part of its inherent authority to regulate the practice of law.").

After a court has performed the function of reviewing and approving such a fee, thus allowing the requisite fee to be paid to the contingent fee counsel, the resulting balance would then be turned over to the General Treasury. *See Hagerty,* 580 N.W.2d at 143, 143–45 (holding that a contingent fee agreement between the Attorney General and outside counsel did not violate the provision in the constitution of that state to the effect that all state "moneys * * * be paid into the treasury and disbursed only pursuant to legislative appropriation" because the contingent fee counsel had an equitable right to a certain portion of any damages).

Accordingly, it is our view that contingent fee agreements between the Attorney General and outside counsel would not be violative of the statutory provisions that require that all money due to or belonging to the state be paid to the General Treasurer.

### Conclusion

We conclude our discussion of the contingent fee issue by emphasizing our awareness that this issue involves competing values—each of which deserves respect. Attorneys who choose to litigate under contingent fee agreements understandably often have motives that, in whole or in part, are monetary in nature. Such motivation is qualitatively different from the more pristine considerations that should guide the Attorney General's decision-making. While we do not look upon

contingent fee agreements with a jaundiced eye due to the fact that they inherently implicate personal profit-making as a motivation,[58] it is precisely because of the possibility of that motivating factor having an influence on decisions made by contingent fee counsel that it is utterly imperative that absolute primacy be accorded at all times to the decision-making role of the Attorney General when he or she has entered into an agreement with contingent fee counsel. Such absolute primacy is necessary in order to ensure that the profit-making motivation is always subordinated to the Attorney General's "common law duty to represent the public interest." *Newport Realty, Inc.,* 878 A.2d at 1032 (internal quotation marks omitted).

### Summary of Conclusions

For the forgoing reasons, we (1) reverse the judgment of abatement with respect to defendants, Millennium, NL, and Sherwin–Williams; (2) affirm the judgment with respect to defendant ARCO; (3) reverse the contempt findings of the Superior Court; and (4) recognize the validity of certain contingency fee agreements between the Attorney General and outside counsel.

■■■ The following observation contained in an opinion authored by Judge Bruce Selya of the United States Court of Appeals for the First Circuit expresses this Court's sentiments:

"This is a hard case—hard not in the sense that it is legally difficult or tough to crack, but in the sense that it requires us * * * to deny relief to a plaintiff for whom we have considerable sympathy. We do what we must, 'for it is the duty of all courts of justice to take care, for the general good of the community, that

---

**58.** We note once again that the Supreme Court Rules of Professional Conduct look with approval upon contingent fee agreements in some contexts. *See* Rule 1.5.

hard cases do not make bad law.'" *Burnham v. Guardian Life Insurance Company of America,* 873 F.2d 486, 487 (1st Cir.1989).

Justice Goldberg did not participate.